2013 VT 38

# Robert Brown v. W.T. Martin Plumbing & Heating, Inc.

[72 A.3d 346]

No. 11-270

Present: **Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Eaton, Supr. J., Specially Assigned**

Opinion Filed June 21, 2013

14

*J. Norman Connor, Jr.*, North Adams, Massachusetts, and *Donovan & O'Connor, LLP*, Bennington, for Plaintiff-Appellant.

*Jeffrey W. Spencer* of *Law Office of Jeffrey W. Spencer, CPCU*, Essex Junction, for Defendant-Appellee.

¶ 1. **Robinson, J.** The central question in this case is whether the workers' compensation laws preclude an impairment rating and associated award of permanent partial disability (PPD) ben-

efits to an injured worker on account of impairment associated with a condition known as Complex Regional Pain Syndrome (CRPS) where a claimant is not diagnosed with CRPS under the criteria listed in Chapter 16 of the American Medical Association Guides to the Evaluation of Permanent Impairment, Fifth Edition (AMA Guides, or Guides), but where a qualified expert confirms the existence of the condition pursuant to other legally admissible standards sufficient to meet a reasonable medical certainty. The Commissioner of the Department of Labor (DOL) and the trial court both concluded that 21 V.S.A. § 648(b) denies the Commissioner discretion to assign an impairment rating and thus award PPD benefits for impairment associated with CRPS where the CRPS diagnosis does not meet the diagnostic standards in Chapter 16 of the AMA Guides. We reverse.

I.

¶ 2. In 2006, in the course of his employment as a master plumber, claimant tore the rotator cuff in his right shoulder when he slipped and fell down a flight of stairs. In January 2007, claimant had surgery to repair the rotator cuff, after which he began physical therapy. His recovery was complicated by adhesive capsulitis — inflammation of the shoulder joint causing stiffness and chronic pain — as well as symptoms of CRPS. In April 2007, claimant underwent shoulder manipulation under anesthesia to treat the adhesive capsulitis; the procedure resulted in increased shoulder motion, but claimant's CRPS symptoms persisted.

¶ 3. Dr. Robert Giering, a psychiatrist and pain management specialist, affirmed the CRPS diagnosis, relying on the diagnostic criteria from the International Association for the Study of Pain (IASP), confirmed that the condition was causally related to claimant's work accident, and treated claimant for the CRPS.

¶ 4. Employer retained its own medical expert, Dr. Kuhrt Wieneke. Dr. Wieneke first saw claimant in March 2008. At that time, Dr. Wieneke confirmed the diagnosis of CRPS and concluded that claimant had not yet reached a medical end. Employer did not challenge the award of temporary disability and medical benefits to claimant on account of the CRPS.

¶ 5. In June 2008, Dr. Giering determined that claimant had reached an end medical result and referred claimant to Dr. Lefkoe for an impairment rating. In October 2008, Dr. Lefkoe issued a sixteen-page report in which he accepted Dr. Giering's

CRPS diagnosis and assigned a forty-six percent whole person impairment rating calculated using the rating process for CRPS in the AMA Guides.

¶ 6. Dr. Wieneke saw claimant again in May 2009 to assess claimant's permanent impairment on behalf of employer. Using the Guides, he concluded that claimant's CRPS had resolved and assigned a three percent whole person rating to claimant's shoulder injury on account of range-of-motion limitations and generalized pain. But because he concluded that claimant did not satisfy the diagnostic criteria for CRPS listed in Chapter 16 of the AMA Guides, Dr. Wieneke did not attribute any impairment for deficits or symptoms associated with CRPS.

¶ 7. After a contested hearing on the question of claimant's impairment rating, the DOL Commissioner issued findings and conclusions. The Commissioner explained that CRPS is a condition of the sympathetic nervous system characterized by burning pain throughout the affected limb. The Commissioner described the four categories of signs and symptoms of CRPS: (1) pain disproportionate to what would be expected from the inciting injury and/or pain in response to a light touch that is not normally painful; (2) changes in skin color and/or temperature in the affected limb; (3) edema, swelling and/or sweating in the affected limb; and (4) motor changes, such as decreased range of motion and or motor dysfunction, and trophic changes involving abnormal nail and/or hair growth.

¶ 8. The Commissioner also explained that the AMA Guides and the IASP rely on similar objective signs to support a CRPS diagnosis. However, Chapter 16 of the AMA Guides requires a greater number of those signs to support a CRPS diagnosis, and calls for consideration only of observed signs, as opposed to reported symptoms. For that reason, the AMA Guides' diagnostic criteria are more stringent than those of the IASP.[1]

¶ 9. The Commissioner had no doubt that under the IASP's diagnostic criteria claimant was properly diagnosed with CRPS, but concluded that the record did not support the CRPS diagnosis under the AMA Guides' diagnostic rubric. As a result, the

---

[1] The Commissioner noted that the standards for diagnosing CRPS pursuant to the more recent AMA Guides, *6th edition*, are more similar to the IASP-endorsed approach although that edition of the Guides does not apply in this case. See *infra*, note 2.

Commissioner concluded: "I am compelled to reject Dr. Lefkoe's opinion — not because it is unpersuasive, but because under the particular circumstances of this case the statute requires it." The Commissioner found that Dr. Lefkoe used the appropriate mechanism under the AMA Guides for rating impairment associated with CRPS, but concluded that unless CRPS is diagnosed in accordance with the criteria outlined in Chapter 16 of the AMA Guides, a claimant is not entitled to a rating for impairment associated with CRPS. Accordingly, the Commissioner assigned a three percent whole person impairment rating per Dr. Wieneke's report.

¶ 10. Claimant appealed to the superior court which held a de novo bench trial on the question of claimant's permanent impairment rating. In a thoughtful opinion, the court compared the competing expert medical opinions and found that Dr. Lefkoe's evaluation was "more comprehensive and explained clearly the basis for his opinion," while "Dr. Wieneke was less thorough and less clear when articulating how he arrived at his permanency rating, at one point contradicting himself while testifying." The court also concluded that Dr. Lefkoe spent considerably more time evaluating claimant than Dr. Wieneke, and drafted a significantly longer and more thorough report.

¶ 11. Nonetheless, like the Commissioner, the court concluded that it was bound to reject Dr. Lefkoe's rating for impairment associated with CRPS because 21 V.S.A. § 648(b) provides, "Any determination of the existence and degree of permanent partial impairment shall be made only in accordance with the whole person determinations as set out in the fifth edition of the [AMA Guides]." The court found that the AMA Guides Chapter 16 criteria "controls both the diagnosis of impairments and the corresponding computation of the impairment rating," and that as a matter of law to qualify for a permanent impairment rating "a condition must be diagnosed in accordance with the AMA Guides 5th criteria." From this, the court concluded that "as a matter of law, in order to qualify for a permanent impairment rating, a condition must be diagnosed in accordance with the AMA Guides 5th criteria."[2] Although the court rejected Dr. Lefkoe's rating of

___

[2] Claimant argued below that the court should apply the Sixth Edition of the AMA Guides because the version of 21 V.S.A. § 648(b) in effect at the time of claimant's injury required use of the "most recent edition" of the AMA Guides. See 1993, No.

claimant's impairment associated with CRPS, it did adopt Dr. Lefkoe's findings concerning impairment associated with claimant's loss of range of motion, and it increased claimant's impairment rating to six percent whole person.

¶ 12. The sole question on appeal is whether 21 V.S.A. § 648(b) requires a factfinder to disallow any permanent impairment rating associated with CRPS where the diagnosis does not comport with the diagnostic standards in Chapter 16 of the AMA Guides.

## II.

¶ 13. A brief review of relevant aspects of Vermont's workers' compensation law and the AMA Guides is helpful. Vermont's workers' compensation law requires employers to provide specified benefits on a no-fault basis to workers who suffer "a personal injury by accident arising out of and in the course of employment." 21 V.S.A. § 618(a)(1). Among the benefits potentially available to an injured worker are medical benefits, *id.* § 640, temporary total or partial disability benefits, *id.* §§ 642, 646, vocational rehabilitation benefits, *id.* § 641, and permanent partial or permanent total disability benefits, *id.* §§ 644, 648.

¶ 14. The award of temporary disability benefits is based on an individual's incapacity for work. *Bishop v. Town of Barre*, 140 Vt. 564, 571, 442 A.2d 50, 53 (1982). Permanent partial disability benefits are awarded based on an assessment of an individual's "impairment," without direct consideration of the impact of that impairment on an individual's capacity to work. *Id.*; see also 21 V.S.A. § 648. Neither the statute nor the DOL's rules define "impairment," but the Vermont Legislature has directed that permanent impairment be assessed using the AMA Guides: "Any determination of the existence and degree of permanent partial

225 (Adj. Sess), § 7 (effective April 1, 1995); see generally *Montgomery v. Brinver Corp.*, 142 Vt. 461, 463, 457 A.2d 644, 645 (1983) (right to compensation for injury is governed by law in effect at time of injury). The AMA published the Sixth Edition of the Guides in 2008, and the current version of § 648(b), which specifically identifies the AMA Guides, Fifth Edition, as the applicable guide for rating permanent impairment, took effect on July 1, 2008. 2007, No. 208 (Adj. Sess.), § 6. The superior court concluded that under either version of the statute, the AMA Guides, Fifth Edition, governs the rating of claimant's permanent impairment resulting from his 2006 injury. On appeal, claimant does not challenge this aspect of the trial court's decision, and does not contest the applicability of the Fifth Edition. Accordingly, citations in this opinion to the AMA Guides refer to the Fifth Edition.

impairment shall be made only in accordance with the whole person determinations as set out in the fifth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment." 21 V.S.A. § 648(b).[3] The statute further provides that the Commissioner shall adopt a supplementary schedule for rating injuries *not* rated by the operative guidelines. The DOL, by rule, has provided that impairments for injuries not rated by the AMA Guides "shall be in proportion to the compensation paid for similar injuries rated by the Guides." Workers' Compensation Rules § 11.2500, 3 Code of Vt. Rules 24 010 003-8, available at http://www.lexisnexis.com/hottopics/codeofvtrules.

¶ 15. Significantly, although the concept of a "diagnosis" may be helpful in describing or labeling an injury, nothing in Vermont's workers' compensation scheme predicates a claimant's entitlement to benefits on the existence of a particular diagnosis. The threshold trigger for benefits is an "injury" — defined in the case of physical injuries as "any harmful . . . change in the body." Workers' Compensation Rules § 2.1240, 3 Code of Vt. Rules 24 010 003-2, available at http://www.lexisnexis.com/hottopics/codeof vtrules. The touchstone for PPD benefits is "impairment" as measured pursuant to the AMA Guides or determined by the Commissioner if the Guides do not rate a particular type of injury. The Guides define impairment as "a loss, loss of use, or derangement of any body part, organ system, or organ function." AMA Guides at 2 (quotations omitted).

¶ 16. The AMA Guides to the Evaluation of Permanent Impairment were developed "in response to a public need for a standardized, objective approach to evaluating medical impairments." *Id.* at 1. The AMA Guides are broken into chapters, each focusing on impairment rating methods for a different organ system or body part, and each authored by experts from the relevant specialties. *Id.*[4] The impairment rating methodologies

---

[3] For convenience, we quote from the current version of § 648(b), rather than the one in effect at the time of claimant's injury; the changes to that subsection effected by the 2008 amendment are immaterial to the statutory analysis.

[4] In addition to providing metrics for quantifying different kinds of impairments, the AMA Guides provide a host of other information such as guidance about conducting examinations and writing reports, *id.* at 21; information about symptoms and their potential etiology, see, e.g., *id.* at 89 (describing types of coughs and potential underlying conditions); background on evolving thinking concerning certain conditions, see, e.g., *id.* at 495 (describing evolving consensus concerning

vary considerably from chapter to chapter, depending on the body parts or organ systems involved. Some impairments can be rated pursuant to multiple chapters. *Id.* at 19. Although the diagnosis associated with an injury may point the examiner to the applicable impairment rating methodology or methodologies in a given case, "diagnosis" per se is not intrinsic to the identification or measurement of many impairments in the AMA Guides. See, e.g., *id.* at 450-79 (rating impairments in range of motion of various joints without reference to diagnosis of condition causing limitation in range of motion); *id.* at 118-20 (rating upper digestive tract impairment with reference to symptoms and signs of upper digestive tract disease or anatomic loss or alteration without regard to specific underlying diagnosis). But see *id.* at 231 (providing that impairment rating for diabetes mellitus varies depending on whether diabetes is Type 1 or Type 2).

¶ 17. The Guides provide two distinct methods for rating CRPS in an upper extremity — one in Chapter 13 relating to the central and peripheral nervous system, *id.* at 343-44, and another at section 16.5e of Chapter 16 relating to the upper extremities, *id.* at 482-83, 495-97. At issue in this case is the approach laid out in Chapter 16.[5] With respect to the diagnosis of CRPS, that chapter identifies eleven objective diagnostic criteria for CRPS and provides that the presence of eight or more of those factors supports a CRPS diagnosis. *Id.* at 496, Table 16-16. For the purposes of assigning an impairment rating, the chapter further distinguishes between CRPS I, also known as reflex sympathetic dystrophy (RSD), and CRPS II, also known as causalgia. *Id.* at 495-96. The CRPS I rating methodology applies when neither the initiating causative factor nor the symptoms involve a specific peripheral nerve or structure, and the CRPS II methodology applies when a specific sensory or mixed nerve structure is involved. Although Chapter 16 lists criteria for identifying CRPS cases, the CRPS diagnosis itself is not a variable in the rating algorithm. Instead,

role of sympathetic nervous system and CRPS); and forms that examiners may, but are not required to use, in conducting their evaluations, see, e.g., *id.* at 515. [5] Dr. Lefkoe and Dr. Wieneke both tied their analyses to Chapter 16; it is not clear from the record why they concluded that this chapter, as opposed to Chapter 13, was better suited to evaluating claimant's injury. See AMA Guides at 19 (where impairment can be rated pursuant to more than one section of AMA Guides, examiner should use chapter relating to organ system where problems originate or where dysfunction is greatest for evaluating impairment).

the loss of motion of the involved joints and the sensory deficits and pain associated with the condition are the determinants of the actual impairment rating for CRPS I. *Id.* at 496.

### III.

¶ 18. With that in mind, we turn to the statute. We are mindful of our traditional deference to the Commissioner's interpretation of workers' compensation statutes, calling for affirmation of the Commissioner's construction absent a compelling indication of error. *Wood v. Fletcher Allen Health Care*, 169 Vt. 419, 422, 739 A.2d 1201, 1204 (1999). We will not, however, "affirm an interpretation that is unjust or unreasonable," *Clodgo v. Rentavision, Inc.*, 166 Vt. 548, 550, 701 A.2d 1044, 1045 (1997), or one that undermines the regulatory purpose of the statute. See *In re Williston Inn Grp.*, 2008 VT 47, ¶ 16, 183 Vt. 621, 949 A.2d 1073 (mem.).

¶ 19. In addition, because the workers' compensation system is remedial, we have an obligation to "construe the Workers' Compensation Act liberally so that injured employees receive benefits 'unless the law is clear to the contrary.' " *Butler v. Huttig Bldg. Products*, 2003 VT 48, ¶ 12, 175 Vt. 323, 830 A.2d 44 (quotation omitted).

¶ 20. Our primary objective in interpreting statutes is to give effect to the intent of the Legislature. To determine that intent, we "must examine and consider fairly, not just isolated sentences or phrases, but the whole and every part of the statute, . . . together with other statutes standing in pari materia with it, as parts of a unified statutory system." *State v. Jarvis*, 146 Vt. 636, 637-38, 509 A.2d 1005, 1006 (1986) (quotation omitted).

¶ 21. The language in question is clear: the Legislature has directed that the AMA Guides are determinative with respect to "[a]ny determination of the existence and degree of permanent partial *impairment*" associated with an injury. 21 V.S.A. § 648(b) (emphasis added). PPD benefits are available for permanent *impairments* associated with an *injury*. *Id..* § 648(a). Nowhere does the statute state that the AMA Guides provide the exclusive mechanism for determining the existence of, or diagnosis associated with, a compensable injury. Rather, the statute declares that the rating of *an impairment* is to be conducted pursuant to the

AMA Guides. See *Payne v. US Airways, Inc.*, 2009 VT 90, ¶ 9, 186 Vt. 458, 987 A.2d 944 (in discerning legislative intent, "we start with the language of the statute and read it according to its plain and ordinary meaning").

■ ¶ 22. To the extent that Chapter 16 of the AMA Guides purports to establish fixed criteria for *diagnosing* CRPS, as opposed to a method for rating the impairment associated with that condition, § 648(b) does not imbue those criteria with the force of law. The Guides may be used as evidence to support expert testimony concerning the presence of CRPS, and a factfinder may choose to rely upon the criteria listed in Chapter 16 of the Guides in determining if a claimant has an injury and whether that injury is appropriately labeled "CRPS." But the Guides do not necessarily contain the exclusive authoritative standard for diagnosing the condition. In the face of competing opinions regarding diagnosis, a factfinder must exercise reasoned judgment in weighing the competing expert opinions. See *Houle v. Ethan Allen, Inc.*, 2011 VT 62, ¶ 9, 190 Vt. 536, 24 A.3d 586 (mem.) (listing factors considered by Commissioner in weighing competing expert opinions).

■ ¶ 23. The dissent keys in on the statute's reference to a "determination of the *existence* and degree" of impairment, and argues that the reference to the "existence" of an impairment suggests that § 648(b) therefore incorporates the AMA Guides' criteria for diagnosing conditions. *Post*, ¶¶ 56-57. The implication is that no impairment exists — that is, no "loss, loss of use, or derangement of any body part, organ system, or organ function" can be found, AMA Guides at 2 — unless claimant is diagnosed with CRPS in conformity with the criteria set forth in Table 16-16 of the AMA Guides. This view conflates injury, impairment, and diagnosis. "Diagnosis" of CRPS is not the same as "the existence of an impairment," and the reference in § 648(b) to the "*existence*" of an impairment does not, as implied by the dissent's analysis, broaden that provision's focus on impairment to include diagnosis, injury, or any other concept; it just reflects an acknowledgment that in some cases an injury may not give rise to *any* associated permanent impairment.

¶ 24. The view that § 648(b) identifies the AMA Guides as the basis for rating impairments, but leaves the determination of the existence of an injury and, where relevant, the diagnosis associ-

ated with that injury to the factfinder to assess based on all the evidence, is congruent with the Commissioner's own past analysis. The Commissioner previously concluded in the context of benefits other than permanency that the AMA Guides' diagnostic criteria for CRPS are not determinative. Workers' Compensation Board: *Chartier v. Cent. Vt. Med. Ctr.*, No. 22-09WC (June 26, 2009), http://www.labor.vt.gov/portals/0/WC/ChartierDecision.pdf. In that case, the Commissioner considered whether a claimant suffered from reflex sympathetic dystrophy (RSD) as a result of a work-related injury. The claimant's treating physician diagnosed the claimant based on criteria outlined in a medical text, and several other treating providers concurred in the diagnosis; the defendant's expert concluded that the claimant did not suffer from RSD on the basis of the criteria outlined in the AMA Guides at Table 16-16. The Commissioner rejected the testimony of the defendant's expert. In that case, the Commissioner was not construing 21 V.S.A. § 648(b), the provision concerning permanent impairment benefits at issue here. However, the Commissioner's findings concerning the role of the AMA Guides are instructive insofar as they reflect the Commissioner's understanding of the distinction between *diagnosing* a condition and *rating* the associated impairment: "The *AMA Guides* are statutorily designated as the standard to use for rating the extent of an injured worker's permanent impairment. Treating doctors do not necessarily refer to the *AMA Guides* to diagnose patients, however." *Chartier*, at 5.

¶ 25. Our interpretation also best jibes with the broader goals of the workers' compensation laws. See *Delta Psi Fraternity v. City of Burlington*, 2008 VT 129, ¶ 7, 185 Vt. 129, 969 A.2d 54 (legislative intent is derived from consideration of "entire enactment, its reason, purpose and consequences" in addition to particular statutory language) (quotation omitted). The Legislature has made it clear that its goal is not to ensure compliance with the AMA Guides as an end in itself; rather, the Guides are a tool to promote the Legislature's goal of ensuring that individuals who suffer permanent impairment as a result of work-related injuries receive appropriate PPD benefits. Section 648 in its entirety reflects a clear statutory intent that no bona fide impairment should go uncompensated simply because the AMA Guides fail to provide a method for assigning a rating to a particular condition. Instead, the statute specifically authorizes the Commissioner to develop methods for rating impairments not covered by the

Guides, 21 V.S.A. § 648(b), and the Commissioner has adopted a rule to ensure that impairments not expressly included in the AMA Guides are rated and lead to compensation, Workers' Compensation Rules § 11.2500.[6] Accordingly, pursuant to the statutory scheme, individuals suffering from impairments *not* specifically described or listed in the AMA Guides nonetheless may be entitled to an impairment rating and associated PPD benefits if supported by sufficient expert testimony.

¶ 26. Applied to the facts of this case, the dissent's construction of the statute is at odds with this legislative goal, as well as the remedial nature of the workers' compensation scheme. *Montgomery*, 142 Vt. at 463, 457 A.2d at 646. Everyone agrees that claimant developed CRPS as a result of his work injury. Even Dr. Wieneke affirmed that diagnosis, although he concluded that the syndrome had resolved by the time claimant reached a medical end. But see Workers' Compensation Board: *H.K. v. Woodridge Nursing Home*, No. 01-07WC (Jan. 16, 2007), http://159.105.83.163/portals/0/WC/U-50905Kennett.pdf (rejecting opinion of expert who opined that claimant did not meet criteria for RSD diagnosis under AMA Guides, noting that "RSD is not a static state, . . . symptoms can ebb and flow," and finding that claimant was likely not highly symptomatic at time that those who opined against diagnosis examined her). No one has suggested that the failure of claimant's condition to satisfy the diagnostic criteria outlined in Table 16-16 of the AMA Guides defeated his entitlement to medical benefits, temporary disability, or vocational rehabilitation benefits associated with his injury. In the dissent's view, claimant *had* a work injury — diagnosed by his providers as CRPS and compensable for the purposes of temporary disability benefits, medical benefits,

---

[6] Consistent with that commitment, and given the absence of a methodology in the AMA Guides for quantifying impairment associated with psychological conditions, the Commissioner accepts impairment ratings based on the State of Colorado's system for rating psychological impairments, as well as ratings developed using tools from chapters of the AMA Guides governing nonpsychological injuries. See, e.g., Workers' Compensation Board: *Simmons v. Landmark Coll.*, No. 35-10WC (Nov. 15, 2010), http://www.labor.vt.gov/portals/0/WC/BarrettSimmonsDecision.pdf (accepting impairment rating predicated on Colorado's rating system for anxiety and depression stemming from work injury); Workers' Compensation Board: *Sargent v. Town of Randolph*, No. 37-02WC (Aug. 22, 2002), http://labor.vermont.gov/Default.aspx?tabid=909 (awarding permanent partial disability benefits on basis of anxiety and depression arising from work-related injury where impairment was based on consideration of Colorado guidelines and AMA Guidelines relating to central and peripheral nervous system injuries).

and vocational rehabilitation benefits. But then, as a matter of law, claimant did *not* have CRPS, and therefore by definition was ineligible for evaluation of any permanent impairment associated with that condition once he reached a medical end point, regardless of any evidence of functional limitations associated with the CRPS pursuant to the AMA Guides' rating system. That would be an incongruous state of affairs given the expressed legislative goal of compensating impairments — not *diagnoses* — resulting from work injuries.

## IV.

¶ 27. The dissent describes the ongoing controversy within the medical community about the best way to diagnose CRPS and argues that the drafters of Chapter 16 of the AMA Guides do not believe that a claimant can be appropriately diagnosed with CRPS unless the claimant's constellation of subjective and objective findings meets the diagnostic criteria set forth in Chapter 16. *Post*, ¶ 41.[7] The question here is not what the drafters of Chapter 16 believe to be the essential components of a CRPS diagnosis; the question is whether, as a matter of law, the statute prevents the Commissioner from assigning an impairment rating under

---

[7] In so arguing, the dissent implies that the American Academy of Neurology classifies CRPS as a "mythical concept," a suggestion that is misleading. Like other medical associations representing fields of practice implicated by CRPS, the American Academy of Neurology recognizes the condition and describes it in a manner that is consistent with the others. See American Academy of Neurology, Complex Regional Pain Syndrome (2013), http://patients.aan.com/disorders/index.cfm?event=view&disorder_id=894. See also National Institutes of Health, NINDS Complex Regional Pain Syndrome Information Page (Sept. 19, 2012), http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/reflex_sympathetic_dystrophy.htm (describing characteristics and treatment of CRPS); American Academy of Orthopaedic Surgeons, Complex Regional Pain Syndrome (Reflex Sympathetic Dystrophy) (June 2010), http://orthoinfo.aaos.org/topic.cfm?topic=a00021 ("It is also important that these patients not be told that the pain is 'in their heads.' CRPS is a physiological condition."). These professional associations all describe the same objective features of CRPS, although they do not embrace a single, uniform prescription for diagnosing the condition (that is — how many of these objectively measurable characteristics must be present, and which ones are essential). The question before us is not which entity got it right, but rather whether in deferring to the AMA Guides with respect to the *rating* of an impairment, the Vermont Legislature also designated the AMA Guides as the sole authority to guide the diagnosis of the underlying condition, or whether the Legislature left it to the factfinder to decide that question based on the evidence presented.

Chapter 16 of the AMA Guides to an individual who has been diagnosed with CRPS by a competent physician using medically-accepted criteria and on the basis of objective findings.[8]

¶ 28. The diagnosis of CRPS itself is not intrinsic to the actual impairment rating process for CRPS. Given a CRPS diagnosis, the AMA Guides provide a coherent set of criteria for evaluating the impairment associated with that condition that do not include the diagnosis itself. The Commissioner specifically found that after diagnosing claimant's condition pursuant to criteria endorsed by a different medical association, Dr. Lefkoe "followed the procedure mandated by the AMA Guides for determining the appropriate impairment rating in cases involving the type of CRPS from which claimant presumably suffers." The trial court likewise found that, setting aside its conclusion that the claimant's impairment was not subject to a rating pursuant to Chapter 16 because his condition did not meet that chapter's diagnostic criteria, Dr. Lefkoe's ultimate permanency rating was correctly computed using Chapter 16 of the AMA Guides.

¶ 29. Moreover, Chapter 16 is not the only chapter in the AMA Guides pursuant to which CRPS can be rated. Chapter 13, relating to the central and peripheral nervous system, also offers a methodology for rating impairments associated with CRPS/RSD in an upper extremity. See AMA Guides at 343-44. That section describes many of the same indicia of CRPS that are listed in Chapter 16. *Id.* at 343, 496. However, in contrast to Chapter 16, nothing in Chapter 13 suggests that a specific minimum number of findings is a prerequisite to a CRPS diagnosis or to a rating for the impairment associated with that condition. The Guides themselves thus provide a different framework for diagnosing CRPS.

¶ 30. The dissent's approach to rating impairment associated with CRPS is also inconsistent with the commitment reflected in both the workers' compensation statute *and* the AMA Guides themselves to ensure conditions that are *not* specifically listed in the AMA Guides are nonetheless ratable. The Guides afford latitude to examiners to exercise discretion in choosing the best

---

[8] Our holding does not leave the factfinder free to conclude that an individual has CRPS based solely on subjective complaints, unmoored to objective observations and medically-accepted criteria. See *post*, ¶ 39 & n.11, ¶ 67. The factfinder's conclusion must be supported by substantial evidence, and medically-accepted methodologies for diagnosing CRPS include objective, observable criteria.

rating methodology for a given condition, AMA Guides at 19, and in selecting a specific rating within the sometimes wide ranges dictated by the Guides, *id.* at 20 passim. And, significantly, the Guides suggest that in situations where the Guides do not provide impairment ratings, "physicians use clinical judgment, comparing measurable impairment resulting from the unlisted condition to measurable impairment resulting from similar conditions with similar impairment of function in performing activities of daily living." *Id.* at 11.

¶ 31. In other words, even if a claimant's condition does not fit within any ratable impairments listed in the AMA Guides, an evaluator may use a closely matching rating methodology in the AMA Guides to determine an impairment rating. See *supra,* ¶ 25 & n.6 (statute directs Commissioner to develop methods for rating impairments not covered by Guides, and Commissioner has accepted ratings from chapters of Guides designed for rating nonpsychological injuries in awarding PPD benefits for psychological injuries not otherwise rated in Guides); see also AMA Guides at 11 (recognizing that "[c]linical judgment, combining both the 'art' and 'science' of medicine, constitutes the essence of medical practice"); *id.* at 18 (acknowledging that impairment evaluation process "requires considerable medical expertise and judgment"); *id.* at 19 (expressly authorizing evaluators to deviate from specific guidance of Guides in assigning impairment ratings if, in their considered clinical judgment, methodology in Guides does not produce fitting rating in particular case).

¶ 32. Given that both the statute and the Guides expressly allow evaluators to rate an impairment using the rating method set forth in a specific section of the Guides *even if an individual's condition (or diagnosis) is not the condition (or diagnosis) for which that section is specifically designed,* and given the Guides' own recognition of the importance of an evaluator's clinical judgment in the rating process, it would be odd to say that the Commissioner does not have the discretion to accept a rating under section 16.5e of the AMA Guides for an individual with an established loss of function (or impairment) and a persuasive diagnosis of CRPS based on objective findings and medically-accepted standards when the rating physician concludes that section 16.5e provides the most appropriate method for rating the impairment.

¶ 33. In *Tokico (USA), Inc. v. Kelly* — a case on all fours with this case — the Kentucky Supreme Court provided persuasive analysis on the issue before us. 281 S.W.3d 771 (Ky. 2009). In that case, the Kentucky Supreme Court affirmed an impairment rating for CRPS I even though the physician who gave the rating concluded that the claimant exhibited only seven of the eleven diagnostic criteria in the AMA Guides. *Id.* at 773. The Guides require that "at least eight of the [eleven] findings must be present concurrently for a diagnosis of CRPS," but the physician concluded nonetheless that claimant had "an absolutely classic case" of CRPS I and that "he had no doubt she suffered from 'some definite form' of the condition." *Id.* Using his clinical judgment, the physician concluded that to rate the claimant's impairment using another method would be less accurate than rating for CRPS I based on seven rather than eight objective criteria. *Id.* at 774. Reviewing the rating, the court cited the AMA Guides' acknowledgments that some medical syndromes are poorly understood, and that physicians must use clinical judgment when assigning impairment ratings. *Id.* The court concluded:

> Diagnosing what causes impairment and assigning an impairment rating are different matters. Diagnostic criteria stated in the *Guides* clearly have relevance when judging the credibility of a diagnosis, but [Kentucky's statute] does not require a diagnosis to conform to criteria listed in the *Guides*.

*Id.* at 774-75. Like the Vermont statute, the Kentucky statute at issue required that permanent impairment be assessed pursuant to the AMA Guides. See Ky. Rev. Stat. § 342.0011(35) (" 'Permanent impairment rating' means percentage of whole body impairment caused by the injury or occupational disease as determined by the 'Guides to the Evaluation of Permanent Impairment.' ").[9]

---

[9] In contrast to the *Tokico* decision, the case of *Westmoreland Regional Hospital v. Workers' Compensation Appeal Board*, 29 A.3d 120, 129 (Pa. Commw. Ct. 2011), cited in the dissent, does not address the issue before us. *Post*, ¶¶ 46, 52, 55. In *Westmoreland*, the court faced a situation in which neither the independent evaluator nor the claimant's own doctor documented *any* objective findings to support an impairment rating for CRPS. The court concluded that the AMA Guides did not authorize an impairment rating in the absence of any objective findings at the time of the evaluation. *Id.* The focus of the divided court's analysis was the significance of the presence or absence of objective findings *on the date*

¶ 34. The dissent argues that the rating process for CRPS in Chapter 16 of the Guides expressly incorporates the more stringent diagnostic criteria in order to lend objectivity to the impairment rating. We agree that in evaluating impairment the Commissioner must consider whether the alleged CRPS condition is supported by objective findings, but we note that this is *not* a case in which the CRPS diagnosis is unsupported by objective findings. Drs. Giering and Lefkoe identified a host of objective findings, incorporated into the IASP diagnostic criteria upon which they relied, to support their conclusion. For example, Dr. Giering explained that the color and temperature changes in claimant's affected limb — both factors included in the AMA Guides as factors supporting a CRPS diagnosis — were signs of vasomotor changes that are characteristic of a classic presentation of CRPS. The roadblock to a finding of permanent impairment in this case was the specific minimum number of findings to support the CRPS diagnosis pursuant to Table 16-16 of the Guides. Although parties are free to argue that the Guides' diagnostic criteria are more objective than those of the IASP, and that the Guides are therefore a better tool for determining whether a claimant suffers from CRPS I and is suitable for an impairment rating associated with that condition, it is not consistent with § 648(b) to treat the Guides' method for diagnosing CRPS I as the only legally acceptable method.

¶ 35. We emphasize the limited scope of our holding. We do not hold as a matter of law that claimant in this case is entitled to PPD benefits on account of the aspect of his injury diagnosed as CRPS. On remand, the factfinder is free to conclude that claimant's impairment should not be rated pursuant to section 16.5e of Chapter 16. To the extent that Dr. Wieneke's opinion suggests that claimant has no ratable impairment associated with CRPS, the Commissioner may even conclude that claimant does

---

*of the evaluation by the agency-appointed evaluator* in light of the waxing and waning character of the claimant's symptoms. The dissent attempts to analogize this case to *Westmoreland* by asserting that Dr. Wieneke found no objective evidence of CRPS in his second evaluation. *Post*, ¶ 55. In so arguing, the dissent engages in appellate factfinding, essentially rejecting the evaluations of Drs. Giering and Lefkoe in order to support its conclusion. In contrast to the statutory structure in Pennsylvania, the Vermont statutory scheme does not establish the date of one evaluation as dispositive as against another, provided that both follow the point of maximal medical improvement. The factfinder is free to credit the findings of either examiner if supported by sufficient evidence.

not have an impairment from CRPS at all. However, by deferring to the AMA Guides with respect to the methodology for rating an impairment, the Vermont Legislature has not purported to remove from the Commissioner the discretion to consider conflicting competent expert opinions concerning the presence of an impairment. *Houle*, 2011 VT 62, ¶¶ 13-15 (deferring to Commissioner's factfinding concerning conflicting expert testimony).

¶ 36. For the above reasons, we conclude that the trial court and the Commissioner erred in concluding that 21 V.S.A. § 648(b) and the AMA Guides precluded them, as a matter of law, from considering any evidence of claimant's impairment associated with CRPS. We remand to the trial court for reconsideration of claimant's permanent impairment rating in light of the above analysis.

*Reversed and remanded.*

¶ 37. **Dooley, J.,** dissenting. In decision after decision, we have held that our main goal in construing statutes is to implement the intent of the Legislature. In this case, the majority has construed a statute to weaken its central purpose to bring objectivity, consistency and predictability to the workers' compensation impairment-determination process and the requirements of this process to the point where it is difficult to find any remaining point in having the statute. The majority reaches this conclusion by exploiting what it perceives as a loophole in the drafting of the statute. It is difficult to discern any reason why the Legislature would create such a loophole, and the majority gives us none except to say that we should construe the statute to benefit the claimant. I cannot join a decision the result of which is so clearly contrary to the intent of the Legislature, and therefore dissent.

¶ 38. Our responsibility to construe the statute arises in an area where there has been tremendous controversy over what evidence must be shown to establish the presence of a condition — Complex Regional Pain Syndrome, known by its acronym of CRPS. If the statute's purpose of bringing objectivity and consistency to the impairment-rating process does not produce that effect for CRPS, where it is most needed, it is a paper tiger. Put another way, the majority's resolution of this case may be appropriate for the majority of impairment ratings covered by the American Medical Association Guides to the Evaluation of Permanent Impairment (AMA Guides), Fifth Edition. This is because

most impairment ratings are not dependent on a particular diagnosis. CRPS represents a critical exception to this standard method of impairment rating. For CRPS, the policy of the Guides is that there is *no* applicable impairment absent a diagnosis of CRPS pursuant to the Guides. In other words, the proper impairment rating under Chapter 16 of the Guides — the chapter used in this case — is zero. I would hold, as did the Commissioner and the trial court, that an impairment rating due to CRPS using Chapter 16 of the AMA Guides Fifth Edition necessarily requires that CRPS be diagnosed according to the criteria in that chapter.

¶ 39. Some background is necessary to understanding why the drafters of the Guides Fifth Edition took the approach they did with respect to CRPS. The underlying issue is explained in a recent commentary:

> The basic diagnostic problem of this condition — severe, unrelenting pain out of proportion to the inciting injury — is significantly complicated by the subjective nature of the pain and the need for clear objective measures for the basis of the discomfort. Added to this mix is the fact that there is no diagnostic test specific for CRPS. In a medical setting, these issues create debate over the accuracy of the diagnosis and appropriate treatment. In a compensation context, subjective pain that is out of proportion to the injury is a recipe for unrelenting controversy.

S. Hodge, J. Hubbard & K. Armstrong, *Complex Regional Pain Syndrome — Why the Controversy?*, 13 Mich. St. U. J. Med. & L. 1, 3 (2009).[10] The continuing education program of the American Academy of Neurology has included a classification of CRPS as a "mythical concept." R. Barth, *A Historical Review of Complex Regional Pain Syndrome in the 'Guides Library'*, Guides Newsl. (Amer. Med. Assoc., Chicago, Ill.), Nov./Dec. 2009, at 1 (citations omitted).[11]

---

[10] For an impression of the medical controversy see the interchange between the Chairman of the Scientific Advisory Committee of the International Foundation for RSD/CRPS and the Executive Vice-President of the American Medical Association. Int'l Research Found. for RSD/CRPS (Nov. 30, 2009), http://www.rsdfoundation.org/test/AMAreferences.html.

[11] I have included this background, not to take sides in the controversy over how to diagnose CRPS, but to point out why the AMA took the position it did in the

¶ 40. The AMA rated CRPS in two places in the Fifth Edition of the Guides,[12] a split designed to be "reflective of differences in the clinical approach of different specialties to different conditions and/or organ systems." Letter from Michael Maves, Exec. V.P. of Amer. Med. Assoc., to Anthony Kirkpatrick, Dep't of Anesthesiology, U. S. Fla. (Oct. 28, 2004), available at http://www.rsdfoundation.org/test/AMAreferences.html. The diagnosis and impairment rating in this case are governed by Chapter 16 of the Guides, so I begin my discussion with that chapter, and return to Chapter 13 below.

¶ 41. A finding of CRPS under Chapter 16 "should be conservative and based on objective findings" because many of the symptoms can have different causes. AMA Guides at 496. Thus, under this chapter a diagnosis must be predicated "upon a preponderance of objective findings that can be identified during a standard physical examination and demonstrated by radiological techniques." *Id.* It requires that at least eight of eleven possible objective findings be made. *Id.* These findings must involve objective evidence of disease and cannot simply be based on symptoms. *Id.*

¶ 42. Immediately following the diagnosis requirement in Chapter 16, the Guides set out the methodology for determining impairment for CRPS I and CRPS II.[13] There is no suggestion

---

Guides and why the separation of the diagnosis from the impairment rating totally undermines its policy. The majority asserts that it would allow a diagnosis of CRPS "by a competent physician using medically-accepted criteria and on the basis of objective findings." *Ante*, ¶ 27. I see nothing in its rationale that would impose any of these limits, and the broad statements are not supported by any citation to statute or decision. Under the majority's rationale, a diagnosis of CRPS, based solely on subjective pain complaints and without any "objective findings" or "objective, observable criteria," would be admissible, and if believed, would entitle claimant to an impairment rating for CRPS under the Guides.

[12] There has been a good deal of confusion about whether CRPS could also be rated under Chapter 18 ("Pain"), an idea that was refuted by an AMA-published article in 2006. R. Barth, *Complex Regional Pain Syndrome (CRPS): Unratable Through the Pain Chapter*, Guides Newsl. (Amer. Med. Assoc., Chicago, Ill.), Nov./Dec. 2006. That same article went so far as to recommend rating CRPS under Chapter 14 ("Mental and Behavioral Disorders"), because "psychiatric factors could be used to predict the development of CRPS presentations with 91% accuracy," *id.* at 6 (citation omitted), and because of research revealing that "the majority of CRPS patients met criteria for a personality disorder." *Id.* (citation omitted).

[13] As the majority states, this case involves CRPS I and not CRPS II.

that the impairment determination methodology can be used separately from the diagnosis. Indeed, the placement of the impairment determination instructions right after the diagnosis instructions suggests the contrary intent. The continuing guidance from the AMA is consistent with this interpretation. The AMA publishes a Guides Newsletter, which it calls "a complement to" the AMA Guides. AMA Guides Newsletter, https://commerce.ama-assn.org/store/catalog/productDetail.jsp?product_id=prod1240005& sku_id=sku1240013&navAction=push. In a 2006 clarification of the various ways that CRPS can be rated, the editors of the Guides Newsletter stated: "Do NOT consider the diagnosis of CRPS type 1 for impairment rating purposes unless 8 of the 11 criteria have been documented to be present concurrently." *Rating Impairment for CRPS Type 1*, Guides Newsl. (Amer. Med. Assoc., Chicago, Ill.), Mar./Apr. 2006, at 10.

¶ 43. It is important to emphasize that the AMA approach in Chapter 16 specifically and intentionally rejected the approach of the International Association for the Study of Pain (IASP).[14] In a series of articles in the AMA Guides Newsletter, Dr. Robert Barth explained that the AMA Guides have "recommended against the use of the IASP protocol for CRPS since 1997 (due to predictions, later confirmed, that the protocol would lead to overdiagnosis)." R. Barth, *A Historical Review of Complex Regional Pain Syndrome in the 'Guides Library'*, Guides Newsl. (Amer. Med. Assoc., Chicago, Ill.), Nov./Dec. 2009, at 4. He added that the AMA Guides Fifth Edition, at issue here, "continued the call for clinicians to avoid utilization of the IASP's protocol, in favor of an extensive differential diagnostic process seeking to eliminate alternative diagnoses." *Id.*; see also R. Barth and T. Bohr, *Challenges in the Diagnostic Conceptualization of CRPS-1 (Formerly Conceptualized as RSD), Part 1*, Guides Newsl. (Amer. Med. Assoc., Chicago, Ill.), Jan./Feb. 2006, at 5 ("[T]he IASP protocol is inherently flawed because it represents a departure from epidemiologic guidelines, because it is indistinguishable from alternative diagnostic possibilities, and because it is self-contradictory."); R. Barth and T. Bohr, *Challenges in the Diagnostic Conceptualization of CRPS-1 (Formerly Conceptualized as RSD), Part 2*, Guides Newsl. (Amer. Med. Assoc., Chicago, Ill.), Mar./Apr. 2006,

[14] I include this background because the majority relies upon a diagnosis under the IASP standards as fully complying with the Guides. *Ante,* ¶ 34.

at 2 ("In summary, the logical ramifications of the fourth criterion from the IASP protocol actually cause CRPS-1 to be a diagnosis that never can be credibly adopted for any individual case."). The criticism has also come from a study in the journal *Pain* in 1999, which found that "the majority of cases that satisfied IASP diagnostic criteria were actually from samples of people who were known in advance to not have CRPS I." R. Barth, *A Historical Review of Complex Regional Pain Syndrome in the 'Guides Library'*, Guides Newsl. (Amer. Med. Assoc., Chicago, Ill.), Nov./Dec. 2009, at 3 (citing S. Bruehl, et al., "External Validation of IASP Diagnostic Criteria for Complex Regional Pain Syndrome and Proposed Research Diagnostic Criteria," 81 Pain 147-54 (1999)).

¶ 44. An even stronger indication of the required relationship between the impairment ratings for CRPS is that, as referenced above, the Guides offer two ways of diagnosing CRPS *and each has a separate, unique method of calculating impairment once the diagnosis is made*. The second method is in Chapter 13. Chapter 13 ("The Central and Peripheral Nervous System"), while it contains no checklist of necessary clinical findings for CRPS, gives examples of what clinical findings and radiographic results may lead to such a diagnosis. AMA Guides at 343. It emphasizes that "diagnosis is key and is based on clinical criteria." *Id.* It contains a separate chart to rate an impairment. *Id.*[15]

¶ 45. The presence of a separate method of diagnosis and calculating impairment in Chapter 13 is a clear demonstration that the diagnoses and impairment ratings for CRPS are inextricably intertwined. The drafting is such that the impairment ratings are usable only with the applicable diagnosis.

¶ 46. Additionally, the Guides make clear that permanent impairment ratings are to be made only once a patient has reached "maximal medical improvement" (MMI). AMA Guides at 19. This phrase "refers to a date from which further recovery or deterioration is not anticipated, although over time there may be some

---

[15] In the interchange noted in note 10, *supra*, the Vice-President of the AMA wrote, "The neurology approach [of Chapter 13], which enables the physician to rely on their own judgment, enables evaluators to incorporate the latest in evidence based medicine." Letter from Michael Maves, Exec. V.P. of Amer. Med. Assoc., to Anthony Kirkpatrick, Dep't of Anesthesiology, U. S. Fla. (Oct. 28, 2004), available at http://www.rsdfoundation.org/test/AMAreferences.html.

expected change." *Id.* It is on that date that the existence or lack of evidence of the objective signs of CRPS must be evaluated. See *Westmoreland Reg'l Hosp. v. Workers' Comp. Appeal Bd.*, 29 A.3d 120, 129 (Pa. Commw. Ct. 2011) (noting that the AMA Guides required an impairment rating of zero for CRPS because "[c]laimant did not exhibit objective symptoms . . . *at the time of the [impairment rating evaluation]*" (emphasis added)). The editors of the Guides Newsletter have emphasized the particular importance of reaching this stage before rating CRPS cases for permanent impairment as "maximal medical improvement . . . can be slow." *Rating Impairment for CRPS Type 1*, Guides Newsl. (Amer. Med. Assoc., Chicago, Ill.), Mar./Apr. 2006, at 10.

¶ 47. This need to reach a medical end result leads to a difference over the record between the majority and this dissent. The majority describes Dr. Wieneke as agreeing that claimant had CRPS at the point of his first evaluation, although "the syndrome had resolved by the time claimant reached a medical end." *Ante,* ¶ 26. From this, the majority argues that there is an inconsistency in this dissent because I accept that claimant had CRPS for purposes of medical rehabilitation or temporary disability benefits but would hold that when claimant reached an end result he "was ineligible for evaluation of any permanent impairment." *Id.* There is no inconsistency, and the majority failed to describe the essential elements of Dr. Wieneke's opinions.

¶ 48. The statute we are construing applies only to *"[p]ermanent* partial disability benefits." 21 V.S.A. § 648(b) (emphasis added). The AMA Guides are for "Evaluation of *Permanent Impairment.*" (Emphasis added.) Dr. Wieneke never opined that claimant had a permanent impairment from CRPS. Indeed, in his first opinion, he stated that claimant had CRPS but could return to work in six weeks. He made it clear that claimant had not reached a medical end result. In his second opinion, he said that claimant had reached a medical end result and diagnostic points for CRPS "are no longer present." He found that claimant had a work injury and assigned a whole body impairment of three percent based on restricted shoulder functionality and upper body pain.

¶ 49. It is perfectly possible that a claimant could have CRPS, but with the passage of time and medical intervention have no

permanent impairment from CRPS. If we believe Dr. Wieneke, that is precisely what occurred in this case. Under Dr. Wieneke's conclusion, claimant was eligible "for evaluation of any permanent impairment," but not one based on a diagnosis of CRPS and not one based on a CRPS impairment rating. How the Department of Labor treated temporary disability compensation or rehabilitation or medical benefits is irrelevant to this case because the statute at issue does not apply to these items. There is nothing "incongruous" in a holding that claimant is not entitled to a CRPS impairment rating because he does not have CRPS as a permanent condition that results in a permanent impairment.

¶ 50. With this background in mind, I turn to the question before us. The statute in issue reads:

> Any determination of the existence and degree of permanent partial impairment shall be made only in accordance with the whole person determinations as set out in the fifth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment.

21 V.S.A. § 648(b). The majority reads the language as saying that only the degree of permanent partial impairment must be taken from the Guides; any other step in the determination can come from anywhere, no matter what is the basis for the medical diagnosis of CRPS. As I understand the majority opinion, it holds that the impairment ratings for CRPS as contained in § 16.5(e) can be used with any CRPS diagnosis, whether or not it meets the standards of the AMA Guides or any other professional standards, or any other diagnosis where in the clinical judgment of the physician witness the CRPS impairment standards best fit. See *ante*, ¶ 22.

¶ 51. While I find this interpretation creative to maximize a worker's recovery, I think it is inconsistent with the structure of the Guides, the language of the statute, and, most important, the intent of the Legislature. Indeed, the statutory requirement is essentially eliminated.

¶ 52. The first point is obvious from my opening discussion of the drafting of the Guides. The permanent partial impairment ratings set out in the Guides for CRPS are wholly dependent on the corresponding diagnosis of CRPS under the standards in

Chapter 13 or those in Chapter 16. It is not permissible to calculate an impairment rating under Chapter 16 based on a CRPS diagnosis under Chapter 13, as the majority would allow. Even less is it permissible to import a CRPS diagnosis from outside the Guides to go with a CRPS impairment rating under either chapter.[16] As one court has held recently in similar circumstances, where the worker does not meet the Guides' requirements for a diagnosis of CRPS, "the AMA Guides require a zero impairment rating for that condition." *Westmoreland Reg'l Hosp.*, 29 A.3d at 129; see also *id.* at 126 ("Dr. Klein could not assign more than a zero percent impairment to [the CRPS] condition without violating the AMA Guides").

¶ 53. The majority gives a number of reasons why the Guides do not require the opposite result in this case. First, the majority states: " '[D]iagnosis' per se is not intrinsic to the identification or measurement *of many impairments* in the AMA Guides." *Ante*, ¶ 16 (emphasis added). For the reasons I have stated above, CRPS as rated in Chapter 16 is one of the impairments for which diagnosis is intrinsic. If the majority accepts the proposition that there *are* instances where the impairment rating is dependent on the diagnosis under the Guides, CRPS cases fit that description exactly.

¶ 54. Second, the majority argues that the fact that the Guides provide two different methods of diagnosing CRPS supports its position. *Ante*, ¶ 17. Apparently, the majority would conclude that the choices work like a Chinese menu — however CRPS is diagnosed, the claimant's physician can chose whichever impairment rating methodology the physician desires, even if it is not paired with the diagnosis method. There being no clinical reason behind the choice, it will be unsurprising that the claimant, supported by the physician, will choose the impairment rating that will maximize the whole body rating and thus the amount of compensation. Because there is no medical reason for the choice, it is hard to see this as other than playing games with the system. That this is allowed, indeed almost certain, under the majority's rationale is a strong reason to reject that rationale.

¶ 55. As for the language of the statute, the majority has adopted an interpretation of § 648(b) that is not compatible with

---

[16] The claimant chose the impairment rating in Chapter 16, rather than that in Chapter 13, possibly for the reason that the Chapter 16 methodology produces a higher impairment percentage.

its language and does not show a "compelling indication of error" to overturn the Commissioner's interpretation. The majority essentially reads two phrases out of the statutory language — "existence and" and "whole person determinations." Even under the majority's flexible approach, claimant must show a permanent impairment. The medical evidence in this case provides only one diagnosis that supports a permanent impairment of the scope for which claimant seeks compensation — that is, CRPS. If the "existence" question is controlled by the Guides — as the statute says it must be — the answer is that, whatever claimant's symptoms, they are not caused by CRPS and do not show a permanent impairment of the magnitude of a CRPS impairment. As the Pennsylvania court concluded in *Westmoreland*, 29 A.3d at 129, the correct impairment rating in this case for CRPS under the Guides is zero.

¶ 56. The statute provides that "[a]ny *determination* of the existence and degree" of impairment shall be made "in accordance with the whole person *determinations*" in the Guides. 21 V.S.A. § 648(b). As I discussed earlier, the determinations of CRPS in the Guides are based on a diagnosis under the Guides' requirements. Similarly, a determination in an individual case must follow the Guides' process, which starts for CRPS with a diagnosis of CRPS under the Guides' requirements. As I stated in opening this dissent, there are many parts of the Guides in which a conforming diagnosis is not part of the process of determining an impairment rating. That is, of course, the reason that the statute does not specifically refer to a diagnosis; nor does it refer to other parts of the determination process by the label attached by the Guides for that step. Where the Guides do require a specific diagnosis as part of the process of determining an impairment rating, the statute requires that determination process to be followed. The determination process for CRPS requires a CRPS diagnosis.

¶ 57. Narrowly parsing the language of § 648(b), the majority arrives at an interpretation of the statute that allows evasion of its obvious intent. The majority interpretation makes the words "existence" and "determination" superfluous so no case would ever turn out differently if those words were omitted. In this case, the Guides clearly state that there is no permanent partial impairment due to CRPS unless the condition is diagnosed under its requirements. That is the "determination" required by the Guides, and in this case, it is a determination of the existence or nonexistence of

a permanent partial impairment. The Commissioner's construction of the statute is not only reasonable; it is compelled by the statutory language.

¶ 58. The evasion becomes even greater if we accept the majority's holding (addressed below) that, where the claimant's condition does not meet the objective findings requirements for a CRPS diagnosis, the physician can simply rename the claimant's condition to something else — or as lacking an established name — and proceed to an impairment rating as if claimant has CRPS. *Ante*, ¶ 32. In that situation, the "existence" of a permanent impairment is not determined under the Guides and the physician is not making the whole person determination under the Guides.

¶ 59. As support for its construction of the statute, the majority relies upon the decision of the Kentucky Supreme Court in *Tokico (USA), Inc. v. Kelly*, 281 S.W.3d 771 (Ky. 2009), a decision that is binding upon us only if we find it persuasive. Not surprisingly, I do not find it persuasive. The majority reaches its conclusion in this case based on thirty-six paragraphs of analysis. The court in *Tokico* reaches its result based on five sentences of analysis in one paragraph. Its conclusion is actually one sentence: "Diagnosing what causes impairment and assigning an impairment rating are different matters." *Id.* at 774. This simplistic statement assumes that the impairment rating is not dependent on the diagnosis as part of the impairment-rating-determination process. The assumption is wrong for CRPS.

¶ 60. I also note that the statute in *Tokico* is more narrowly. drawn than the Vermont statute. It contains neither the "existence" or "determination" language that is central to the proper interpretation of § 648(b). For this reason, the superior court found *Tokico*[17] unhelpful "as the underlying statute is dissimilar." I agree with the superior court's assessment.

¶ 61. The most significant of the majority's reasons for its interpretation, and in my view the most concerning, comes under the general heading of discretion. This is based on the Guides' "latitude to examiners to exercise discretion in choosing the best rating methodology for a given condition" in selecting a specific rating, and to use judgment in dealing with unrated conditions. *Ante*, ¶ 30. In the majority's view, this discretion means that if a

---

[17] The superior court had only the Kentucky Court of Appeals decision, which reached the same result based on the same reasoning.

physician cannot make a diagnosis of CRPS because the required number of objective symptoms is not present, the physician can consider the condition unrated and use the CRPS impairment rating anyway. *Ante*, ¶ 32. I consider this to be an evasion of the requirements of the statute that makes the statutory requirement meaningless.

¶ 62. In many instances, the ratings leave a great deal of room for clinical judgment in reaching ratings. When they do not give such discretion, however, doctors are not allowed to use their unrestricted judgment to abandon the specific direction of the Guides. Discretion under the Guides does not include rejection of specific, explicit requirements.

¶ 63. This is the holding of *In re Rainville*, 732 A.2d 406 (N.H. 1999). The New Hampshire statute requires that certain permanent partial impairment ratings be made "in accordance with the percent of the whole person specified for such bodily losses in the most recent edition of 'Guides to the Evaluation of Permanent Impairment' published by the American Medical Association." *Id.* at 411. In *Rainville*, the petitioner's doctor diagnosed the petitioner with "myofascial pain," resulting in twenty percent loss of the function of each shoulder, and neck pain. The doctor used the Guides to calculate the whole person impairment of eighteen percent. The New Hampshire Compensation Appeals Board rejected the medical opinion under the statute because the Guides do not recognize myofascial pain. The Supreme Court reversed, holding: "[I]n view of the *AMA Guides*'s own instructions and our liberal construction of [the statute] . . . , we hold that if a physician, exercising competent professional skill and judgment, finds that the recommended procedures in the *AMA Guides* are inapplicable to estimate impairment, the physician may use other methods not otherwise prohibited by the *AMA Guides*." *Id.* at 413. The court went on to add: "We caution that our decision does not permit physicians or claimants to deviate from procedures simply to achieve a more desirable result. To satisfy the statutory requirements . . . , a deviation must be justified by competent medical evidence and be consistent with specific dictates and general purpose of the *AMA Guides*." *Id.* It also added: "Whether and to what extent an alternative method is proper, credible, or permissible under the *AMA Guides* are questions of fact to be decided by the board." *Id.*

¶ 64. Here, the majority is trying to use the discretion in the Guides exactly in the way that *Rainville* rejects. The "specific

dictates" of the Guides establish the permissible methodologies for determining an impairment rating for CRPS; they do not leave room for a physician to use a different one. Where a condition is unrated, the Guides allow discretion in applying ratings by analogy. Where a condition is rated, and the Guides clearly and specifically state what evidence a physician must find to use that rating, the physician cannot apply the rating without that evidence.

¶ 65. There is another important part of the *Rainville* opinion — the court's specific holding that whether a deviation from the Guides is appropriate is a determination of fact. In this case, both the Commissioner and the superior court found that they were required by statute to use the diagnosis requirements for CRPS in Chapter 16, which led them to rule against claimant. It is important to observe, however, that claimant never argued below or in this Court for the appropriateness of a deviation from the Guides in the style of *Rainville* — rather, he makes a purely legal argument that a diagnosis under the Guides is not necessary. Thus, neither the Commissioner nor the superior court was called upon to do specific fact-finding required by *Rainville*.

¶ 66. There is a broader point here. Claimant never argued that a physician can use the CRPS rating section of the Guides "even if an individual's condition (or diagnosis) is not the condition (or diagnosis) for which that section is specifically designed." *Ante*, ¶ 32 (emphasis omitted). The broad dicta of the majority's decision, dicta that will have more far-reaching effect than the specific holding with respect to CRPS or the construction of § 648(b), has been reached with no consideration by the Commissioner, who has primary jurisdiction over workers' compensation cases, nor by the superior court, and with no briefing or argument in this Court, under the guise that the majority is simply explaining its reasons for its statutory construction decision. It is the equivalent of repealing § 648(b). It is inappropriate to render this kind of decision in this way in this case.

¶ 67. Finally, as I stated in the opening paragraph, the purpose of § 648(b) is to bring objectivity, consistency and predictability to the impairment determination process. See, e.g., *Redd v. Kansas Truck Ctr.*, 239 P.3d 66, 76 (Kan. 2010); *Harvey v. H.C. Price Co.*, 957 A.2d 960, 965 (Me. 2008); see also 4 A. Larson & L. Larson, Workers' Compensation Law § 80.07[2] (2011); AMA Guides at 4. The majority's holding goes exactly in the opposite direction,

introducing subjective decision-making into the diagnosis that is determinative of the Guides' impairment rating. It eliminates objectivity and predictability in the impairment determination process. In view of the track record of subjective CRPS evaluations, the determination involved here is the last that should deviate from the Guides. See Hodge, Hubbard & Armstrong, *supra*, at 20 ("It is common knowledge that in the battle of the experts, both sides are capable of securing witnesses who will testify about whether the employee does or does not have CRPS.").

¶ 68. I return to the central policy that our primary objective in interpreting statutes is to implement the intent of the Legislature. See *In re Carroll*, 2007 VT 19, ¶ 9, 181 Vt. 383, 925 A.2d 990. The majority has found an ambiguity in the legislative drafting that it can exploit, but it has not found a reason why the Legislature would ever intend its construction of the statute, which so clearly undermines its intent. Indeed, I urge the Legislature to take a close look at § 648(b) in light of this decision. It no longer provides meaningful regulation of the impairment rating system.

¶ 69. I dissent. I would affirm the well-reasoned decisions of the Commissioner and the superior court.

¶ 70. I am authorized to state that Judge Eaton joins this dissent.