**TOKICO (USA), INC., Appellant,**

v.

**Krystal KELLY; Honorable Chris Davis, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

No. 2008–SC–000480–WC.

Supreme Court of Kentucky.

April 23, 2009.

As Corrected April 29, 2009.

Jo Alice Van Nagell, Patrick Joseph Murphy, II, Casey, Bailey & Maines, PLLC, Lexington, KY, Counsel for Appellant, Tokico (USA), Inc.

Theresa C. Gilbert, Denney, Morgan, Rather & Gilbert, Lexington, KY, Counsel for Appellee, Krystal Kelly.

## OPINION OF THE COURT

An Administrative Law Judge (ALJ) found that the claimant sustained a 39% combined permanent impairment rating for a work-related right arm injury and resulting psychological condition. The Workers' Compensation Board and the Court of Appeals affirmed. Appealing, the employer asserts that the ALJ awarded benefits erroneously for a condition that was not diagnosed in accordance with the Fifth Edition of the American Medical Association's *Guides to the Evaluation of Permanent Impairment (Guides),* for deficits that were not assessed in accordance with the *Guides,* and for an injury that had not reached maximum medical improvement (MMI). We affirm for the reasons stated herein.

The claimant worked for the defendant-employer as a machine operator. Her right hand slipped and hit the side of a machine as she attempted to pull an improperly-placed bolt pin from a brake caliper assembly on February 11, 2004. A sharp pain shot up into her arm immediately and caused her to become nauseated. She stated that she informed a supervisor after her hand became sore and swollen but completed her shift. She clocked out early the following day due to intense pain and sought treatment in the emergency room.

Emergency room records indicate that the claimant presented on February 12,

2004, complaining of right hand pain. A physician diagnosed cellulitis after an x-ray revealed no evidence of a fracture, dislocation, or other acute change. Dr. Saylor, the claimant's family physician, noted on February 13, 2004, that there was "no cut/no trauma" and diagnosed cellulitis. She revised the diagnosis when a subsequent bone scan revealed findings consistent with reflex sympathetic dystrophy (RSD), which is also known as complex regional pain syndrome (CRPS). Like the emergency room records, her notes fail to mention a work-related injury.

The claimant first saw Dr. Burgess in March 2004. He received a history of the work-related hand injury, diagnosed early dystrophy, and began to treat her. Dr. Burgess diagnosed CRPS–1 in January 2005. In June 2006 he found the claimant to be at MMI although he thought that she would benefit from continued treatment. He assigned an 11% permanent impairment rating based on loss of range of motion and a 3% rating based on pain.

Dr. Lester also treated the claimant. He found her to be at MMI in April 2006 and assigned an 18% impairment rating based on loss of grip strength.

Dr. Kriss evaluated the claimant in January 2007. He concluded that she had "an absolutely classic" case of Type 1 CRPS (CRPS–1) as confirmed by the history of trauma and a delayed onset of persistent edema, skin color changes, hyperpathia, allodynia, disuse atrophy, non-focal osteopenia, objective temperature changes, a dramatic and unequivocal response to sympathetic blockade, plain film joint changes, increased uptake on bone scan, partial response to steroids, and persistent and severe neuropathic pain that is out of proportion to the trauma. Although he acknowledged that the claimant met only seven of the eleven diagnostic criteria found in Table 16–16 of the *Guides* rather than the required eight, he stated that he had no doubt she suffered from "some definite form" of the condition.

Dr. Kriss assigned a 28% impairment rating using Table 16–10, which rates sensory deficits or pain resulting from peripheral nerve disorders. Explaining that the *Guides* instruct physicians rating CRPS–1 to combine the ratings for neurologic deficit and loss of joint motion, he used the combined values chart to combine the 28% rating with the 11% rating that Dr. Burgess assigned. This yielded a 36% rating. Addressing causation, he noted that the claimant had no signs or symptoms of CRPS before the incident at work and that the mechanism of injury, immediate onset of symptoms, and development of objective signs of CRPS were "quite typical" of the condition.

Dr. Burgess responded to the employer's questions in February 2007, indicating that the claimant complained of right hand/arm pain consistently. Although he rated her impairment based on range of motion, he did not think it inappropriate to rate it based on grip strength. He indicated that at no time during his treatment did the claimant meet the *Guides'* diagnostic criteria for CRPS and that it was inappropriate to rate her impairment using Table 16–10. He also indicated that he did not measure range of motion in the left wrist.

In a March 2007 report to the employer's attorney, Dr. Lester stated that he did not think impairment for CRPS–1 should be rated using Table 16–10 because the table relies on sensory deficits, which are "subjective." Explaining his rationale for rating loss of grip strength, he stated that he considered a rating based on functional ability to be "objective or more reliable."

The employer submitted an evaluation by Dr. Pursley. Taking issue with Dr. Kriss, he stated that that the claimant had

a history atypical for CRPS because the earliest medical records failed to mention a work-related incident. He stated that she did not meet the *Guides'* diagnostic criteria, had no specific diagnosis for the cause of her wrist and hand complaints, and was not at MMI. Dr. Pursley disagreed with the impairment rating that Dr. Lester assigned, stating that the *Guides* do not permit loss of grip strength to be rated where pain prevents valid strength testing. He also disagreed with the rating that Dr. Burgess assigned because nothing indicated that he measured both upper extremities or that he measured both active and passive range of motion.

After submitting Dr. Pursley's report, the employer deposed Dr. Kriss. When asked whether he should have rated the claimant under Table 16–10 because she did not meet the *Guides'* diagnostic criteria, he stated that he exercised his clinical judgment and questioned the use of rigid criteria to diagnose a condition that is poorly understood. He insisted that the claimant had CRPS–1 or something very similar and that to rate her impairment another way would be more inaccurate than rating her based on seven rather than eight objective criteria. Questioned about the impairment rating that Dr. Burgess assigned, Dr. Kriss emphasized that he was not an orthopedist. He read aloud certain portions of the *Guides* regarding the measurement of upper extremity range of motion at the prompting of counsel for the employer. He acknowledged that range of motion measurement is unreliable when pain fluctuates or measurements fluctuate among exams.

Addressing the psychological portion of the claim, Dr. Sprague testified that the injury produced a 4% impairment rating based on a pain disorder and an adjustment disorder with anxiety and depressed mood. Dr. Ruth attributed a 2% impairment rating to depression due to pain and right hand limitations but did not attribute it to an injury at work.

Relying on Drs. Kriss, Burgess, and Sprague, the ALJ determined ultimately that the work-related injury caused CRPS in the claimant's right hand as well as a psychological condition and that the conditions produced a 39% impairment rating. The ALJ noted specifically that Dr. Burgess stood by his rating when questioned by the employer and that he "even tested the loss of range of motion under anesthesia." Having failed to convince the Board or the Court of Appeals, the employer continues to assert that the medical evidence supporting the decision did not conform to the *Guides*.

The employer asserts that the ALJ erred by relying on Dr. Kriss because his diagnosis of CRPS and the impairment rating that he assigned to the condition do not conform to the *Guides*. We disagree.

KRS 342.730($l$)(b) bases partial disability benefits on a permanent impairment rating, which KRS 342.0011(35) defines as being the "percentage of whole-body impairment" that an injury causes "as determined by" the latest edition of the *Guides*. Neither statute refers to a physician's diagnosis. Chapter 1 of the Fifth Edition discusses the *Guides'* philosophy, purpose, and appropriate use. Page 11 acknowledges that "some medical syndromes are poorly understood," that physicians must use clinical judgment when assigning impairment ratings, and that "clinical judgment, combining both the 'art' and 'science' of medicine, constitutes the essence of medical practice." Diagnosing what causes impairment and assigning an impairment rating are different matters. Diagnostic criteria stated in the *Guides* clearly have relevance when judging the credibility of a diagnosis, but

Chapter 342 does not require a diagnosis to conform to criteria listed in the *Guides.*

The employer relies on *Jones v. Brasch–Barry General Contractors,* 189 S.W.3d 149 (Ky.App.2006), which concerned an ALJ's authority to rely on a physician who conceded that a worker's back condition fell within a particular impairment category but disagreed with the percentages called for in the *Guides. Jones* is instructive though distinguishable. The present case concerns an ALJ's authority to choose among the opinions of physicians who diagnose a condition differently and who interpret the *Guides* differently when rating impairment for the condition.

 Although the proper diagnosis of a medical condition and the proper interpretation of the *Guides* are medical questions,[1] an ALJ must decide the legal significance of conflicting medical evidence. Dr. Kriss acknowledged that the *Guides* required eight objective diagnostic criteria and that the claimant met only seven, but he offered a reasonable explanation of his basis for the diagnosis of some form of CRPS–1. Although other physicians offered different opinions, nothing in their testimony compelled the ALJ to reject his diagnosis. Dr. Kriss indicated that he followed the method the *Guides* set forth to assign a permanent impairment rating based on CRPS–1. Although other physicians differed regarding the proper method to rate the claimant's impairment, none testified that he used an improper method to rate impairment from CRPS–1.

 The employer argues next that the ALJ erred by basing the award in part on the impairment rating that Dr. Burgess assigned for loss of range of motion. Asserting that Dr. Burgess failed to follow the *Guides* when evaluating loss of range of motion to the right wrist, the employer relies on Dr. Pursley's testimony, on Dr. Burgess's admission that he failed to measure range of motion in the left wrist, and on Dr. Kriss's deposition testimony. Despite the employer's assertion, the ALJ determined reasonably that Dr. Burgess's opinions were more credible than the conflicting evidence.

Dr. Burgess had treated the claimant for more than two years when he found her to be at MMI. He stated that he used the *Guides* when assigning a permanent impairment rating based on loss of range of motion and did not alter his opinions when questioned by the employer. Although Dr. Kriss answered the employer's questions about the rating that Dr. Burgess assigned, at no time did he state that it should be excluded from the combined 36% rating for CRPS–1. Although Dr. Pursley took issue with several of Dr. Burgess's medical opinions, his testimony and the other conflicting evidence did not compel a different result.

 The employer's final argument is that the ALJ erred by relying on Dr. Sprague regarding the impairment rating for the psychological condition. The employer asserts that the claimant had not reached MMI when Dr. Sprague evaluated her in November 2006 because he stated that she had not received treatment although her symptoms warranted it. Noting that the *Guides* direct impairment to be rated at MMI, the employer argues that the evidence compelled the ALJ to rely on Dr. Ruth because he evaluated her in February 2007, at which point her condition had improved with counseling and medication. We disagree.

 MMI refers to the time at which a worker's condition stabilizes so that any impairment may reasonably be viewed as

---

1. *See Kentucky River Enterprises, Inc. v. Elkins,* 107 S.W.3d 206 (Ky.2003).

being permanent.[2] The need for additional treatment does not preclude a finding that a worker is at MMI.[3] Dr. Sprague made the statement to which the employer refers, but he also noted that the claimant was taking Cymbalta, a brand name of Duloxetine, which is used to treat depression and generalized anxiety disorder.[4] Dr. Savior's records indicated that she had been taking the medication for more than a year when Dr. Sprague evaluated her. Although she received additional treatment after his evaluation, we are not convinced that the evidence compelled the ALJ to determine that Dr. Sprague rated her impairment prematurely or that Dr. Ruth's opinion was more credible.

The decision of the Court of Appeals is affirmed.

All sitting. All concur.

---

**2.** *See Guides* at 19.

**3.** *W.L. Harper Construction Co., Inc. v. Baker,* 858 S.W.2d 202, 204 (Ky.App.1993).

**4.** *See,* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html (last revised September 1, 2008).