RENDERED:  OCTOBER 9, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0634-WC

XENIA R. MYERS                                                                APPELLANT


PETITION FOR REVIEW OF A DECISION
v.                   OF THE WORKERS' COMPENSATION BOARD
ACTION NO. WC-08-91428


MERIT ELECTRIC, LLC;
HON. BRENT E. DYE, ADMINISTRATIVE
LAW JUDGE; and WORKERS' COMPENSATION
BOARD                                                                          APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, KRAMER, AND TAYLOR, JUDGES.

KRAMER, JUDGE:  Xenia R. Myers appeals from a March 6, 2020 opinion of the

Workers' Compensation Board ("Board").  In *Western Baptist Hospital v. Kelly*,

827 S.W.2d 685 (Ky. 1992), the Kentucky Supreme Court described the role of the

Court of Appeals in reviewing decisions of the Board:  "The function of further

review of the WCB in the Court of Appeals is to correct the Board only where the

[] Court perceives the Board has overlooked or misconstrued controlling statutes or

precedent, or committed an error in assessing the evidence so flagrant as to cause

gross injustice." *Id.* at 687-88. Here, the arguments Myers advances in this appeal

are duplicative of what she asserted before the Board. We have thoroughly

reviewed the record, the arguments of the parties, and the law. Upon our review,

we conclude that the Board's dispositions of Myers' arguments, as set forth in its

opinion, were not in error, but rather were indicative of a thorough understanding

of the underlying evidence and a correct application of the law. We therefore

affirm and adopt the Board's opinion as follows:

> Xenia R. Myers ("Myers") seeks review of the October 1, 2018, Opinion, Award, and Order of Hon. Brent E. Dye, Administrative Law Judge ("ALJ") finding she sustained a work-related injury on March 25, 2008, and awarding income and medical benefits. Myers sustained a horrendous work injury when her mini-excavator overturned crushing her left foot. Ultimately, her left leg below-the-knee had to be amputated. The ALJ awarded periods of temporary total disability ("TTD") benefits, permanent partial disability ("PPD") benefits, and medical benefits. Myers also appeals from the October 30, 2019, Order denying her petition for reconsideration.[FN]
>
>> [FN] In the same order, the ALJ granted the Respondent's petition for reconsideration relating to the rendition date of the opinion.
>
> On appeal, Myers challenges the decision on four grounds. Myers first argues the ALJ erred in

recalculating the impairment rating of Dr. Robert Jacob. Myers then contends the ALJ incorrectly determined she attained maximum medical improvement ("MMI") sometime after the surgery amputating her left leg. Myers maintains the ALJ should have found she did not attain MMI until sometime after her March 4, 2016, revision surgery. Next, Myers argues the ALJ erred in accepting Dr. Walter Butler's 5% impairment rating for the psychological injury and in rejecting the 50 to 55% impairment rating assessed by Dr. William Wilkerson. Finally, Myers argues the ALJ erred in not finding she is totally occupationally disabled.

## BACKGROUND

Myers' May 8, 2015, Form 101 alleges she sustained a work-related injury on March 25, 2008, in Cedar Park, Texas, when a "mini-excavator slammed into a ditch and jarred [her] foot out of the cab. Foot got crushed between [the] side of ditch and mini excavator." The Form 101 states the doctors "tried to fix bones and tissue in foot, eventually got MRSA and had to have amputation. Now having issues with major scar tissue where skin, muscle and blood was taken from for [sic] the top of my foot."

The medical records of Myers' treating physicians were introduced along with the reports of the doctors who evaluated her physical and psychological condition and provided impairment ratings pursuant to the 5th Edition of the American Medical Association, Guides to the Evaluation of Permanent Impairment ("AMA Guides").

The September 4, 2018, Benefit Review Conference Order & Memorandum ("BRC") reflects the parties stipulated Myers sustained a work-related injury and was paid three periods of TTD benefits from March 26, 2008, through May 25, 2014, from May 26, 2014, through August 17, 2014, and from March 4, 2016, through July 14, 2016. The parties also stipulated Merit Electric paid

medical expenses of $306,921.21, Myers' pre-injury average weekly wage, and she had not returned to work since the injury. The parties further stipulated Myers possesses a high school diploma and a real estate license which had expired. The contested issues were as follows: KRS[1] 342.730 benefits, credit for TTD overpayment (duration), and KRS 342.165 safety violation. Under "Other contested issues" is the following: "(1) Compensability 2/27/13 & 4/10/15 travel expenses, (2) + the requested credit period is 9/2/09-8/17/14, & (3) Plaintiff's failure to timely present any medical reimbursements requests. The parties agree to have a deposition in lieu of a hearing. Both parties are alleging safety violations against each other. The Plaintiff has 30 days to obtain a psychological permanent impairment rating. If so, the Defendant may file the applicable motion."

Myers testified at an August 12, 2015, deposition and at a September 4, 2018, deposition presided by the ALJ.

At her August 2015 deposition, Myers testified she has lived in Mobile, Alabama, for almost two years. She has a high school diploma from Walla Walla Valley Academy in Washington state and her high school GPA was 3.92. She attended technical school for three months. While living in Oregon, Myers also obtained an Oregon real estate license in 2000 which has expired. Myers testified the first time she took the test to obtain an Oregon real estate license she scored 95% and thereafter received multiple employment offers from real estate agencies. From the time she graduated from high school in 1992 until she went to work for Phil Myers Construction in December 2000, she worked at Ventura Foods in Portland, Oregon.[FN]

[FN] Phil Myers is her father.

---

[1] Kentucky Revised Statute.

She worked briefly in the plastics department, filled in at quality control, and then moved to supervisor of her operating line. Because of harassment from another employee, Myers left Ventura Foods at the end of 2000 to work for her father's business from December 2000 to October 2006 as a painter and trim carpenter. She also worked as a project manager for nine months. She quit because her father retired in October 2006.

Myers began working for Merit Electric in February or March 2007 and served as an electrician's helper. On-the-job training was the only training she received. She did not possess a journeymen's license nor did she reach apprentice status. During her tenure at Merit Electric, she worked as an electrician's helper. All of her experience was hands-on with no other direct training provided.

Myers acknowledged she had operated a mini excavator and a tugger in the past. She described a tugger as a heavy piece of equipment. Paul Reeves ("Reeves") was her foreman the entire time she worked for Merit Electric. Because Reeves trusted Myers' skills, he allowed her to operate the mini excavator. Reeves knew Myers was very particular and careful in performing her work, and Reeves had trained Myers on how to operate the mini excavator.

Myers provided a description of how the mini-excavator turned over on March 25, 2008. Myers was treated in Austin, Texas by Dr. Kelly Tjelmeland, a plastic surgeon, and Dr. Mark Dalton, an orthopedic surgeon. Ultimately, Dr. Dalton was required to amputate her leg on June 9, 2008. Dr. Dalton informed her she eventually would have to undergo revision surgery. Myers underwent physical therapy in Texas and obtained pain management treatment in multiple states.

When she saw Dr. Sudhakar Madanagopal in Mobile, Alabama, he proposed revision surgery.[FN]

-5-

[FN] The Form 105 – Medical History reflects Myers was treated by Dr. Dalton from 2008 to 2010 and first saw Dr. Madanagopal in March 2015. The medical records establish that in late 2015 or early 2016, Dr. Madanagopal moved from the University of South Alabama in Mobile, Alabama to Huntsville, Alabama.

This was the surgery Dr. Dalton had previously recommended.

Myers has not worked or looked for work since the injury. At the time of her deposition, she was taking no prescription medication. She estimated that since the injury she has gained approximately 35 pounds. She is unable to exercise explaining as follows:

Q: What would you try to do for exercise?

A: I'd walk around the block, take my dog for a walk. And I can manage that for about two weeks and then I've got blisters – so many blisters that I can't even wear my leg.

Q: Where are the blisters located?

A: On the scar tissue on the back of my leg.

Myers believes she is unable to perform desk work, because sitting for more than a couple of hours causes left leg pain which necessitates removal of the prosthetic device and elevating [her] leg. Except for a September 2008 fall which bruised her leg, Myers has had no other accidents. Although she experiences pain, she has refused to take prescription medication. She believes she is unable to perform sedentary work because she has a hereditary circulation problem. She explained that when she sits too long, the blood pools in her feet and builds up

causing her knees to swell. Myers admitted a doctor has never diagnosed this condition. Her doctors have recommended work hardening training in which she is interested.

Myers described her day-to-day activities as "not a lot." She and Reeves plan to remain in Mobile, Alabama.[FN]

> [FN] Myers described Reeves as her common-law husband since the state of Alabama recognizes common-law marriage.

Myers further testified her only work experience has been as a painter, carpenter, and electrician's helper, and she also worked as a cashier at McDonald's for three months. She has never possessed a commercial driver's license. All of her previous jobs entailed working on her feet all day. Although she obtained an Oregon real estate license, she has never worked as a real estate agent.

Myers believed she has "tons" of emotional problems as a result of the amputation. She has a monthly psychological counseling session.

At the December 4, 2018, deposition, Myers testified Dr. Madanagopal performed a revision surgery in Huntsville, Alabama, on March 4, 2016. The surgery consisted of shortening the bone, modifying the skin flap, and working on the nerve endings. Dr. Madanagopal is the only physician to treat her since the revision surgery. She last worked on the date of the injury. She reiterated that most of her previous work entailed very heavy physical labor. Myers believes she is unable to return to work since it would cause excessive abuse of her left leg, and being on her left leg for even one hour causes extreme pain. She estimated that, at the most, she could bear weight on her left leg for approximately two hours. When she performs sedentary work, her right leg swells. Myers testified both Drs. Tjelmeland and Dalton

informed her revision surgery would eventually be necessary.

At the time of her deposition, Myers was living in Mobile, Alabama, where she and Reeves own a house. She last saw Dr. Madanagopal in 2016.

Myers has not sought an Alabama real estate license. She possesses an Alabama driver's license with a corrective lens restriction. Hanger Clinic in Mobile, Alabama takes care of her prosthetic needs. Myers is able to ambulate with her prosthetic device inside and outside the house. Despite the report of Hanger Clinic to the contrary, Myers denied walking on uneven terrain, curbs, ramps, stairs, grass, and gravel daily. Myers testified Josh Richardson ("Richardson") at Hanger Clinic, who authored the report, had never specifically asked about her ability to walk using the prosthetics. She acknowledged Richardson correctly stated in July 2017 that she performed yard work and pushed her lawn mower. She denied seeing Richardson's report.

Myers testified that she obtained a good result from the revision surgery. She was treated for psychological problems by Austin Pain Associates in 2008 and 2009 and has seen no one else seen that time for her psychological problems. She has adhered to taking no prescription medications except for when Dr. Madanagopal placed her on Neurontin through December 2017. At the time of her deposition, she was not taking any medication.

Myers does nothing other than yard work. She no longer uses the push mower to mow her lawn and instead uses a riding lawn mower. Even then, the vibration she experiences while on the lawn mower bothers her leg. She estimated she mows approximately once a week. She previously walked a mile every other day for approximately two weeks. However, before she can resume walking, she has to let her leg heal. She

estimated she drives a car once every couple of weeks. Shopping hurts her leg. Myers' left leg is always uncomfortable and bothered her during the deposition. Standing "really hurts" her leg. Myers is able to negotiate her house stairs daily but because her bedroom is upstairs she limits her trips on the stairs. She has trouble sleeping more than five or six hours a night. When she experiences a pain-producing event, she is able to recuperate in approximately a day. She is unable to do any of her previous work. The prosthetic device Myers uses has three parts – the socket which she has had for two years, a stem which she has had for two years, and the foot she has had for seven years. Myers is capable of performing laundry work, house cleaning, shopping, climbing stairs, and ramps. She is unable to perform gardening work. In the last two years, she has not bicycled, danced, exercised, or taken long walks.

Relative to the issues on appeal, after summarizing the evidence, the ALJ provided the following:

### I. TTD Benefits

KRS 342.0011(11)(a) establishes TTD means that ". . . the condition of an employee who has not reached [MMI] from an injury and has not reached a level of improvement that would permit a return to employment." (emphasis added). The word "and" indicates KRS 342.0011(11)(a) contains a two-prong test, which claimants must both satisfy, to receive TTD benefits. Double L Const., Inc. v. Mitchell, 182 S.W.3d 509 (Ky. 2005); Magellan Behavioral Health v. Helms, 140 S.W.3d 579 (Ky. App. 2004).

**A) MMI**

A claimant's condition reaches MMI, when it stabilizes to the point that an impairment is reasonably permanent. Tokico (USA), Inc. v. Kelly, 281 S.W.3d 771 (Ky. 2009). The MMI date is a medical question, and reserved for medical expert witnesses. KY River Enters., Inc. v. Elkins, 107 S.W.3d 206 (Ky. 2003); Lanter v. Kentucky State Police, 171 S.W.3d 45, 52 (Ky. 2005). However, under certain circumstances, an ALJ may infer a claimant's condition has stabilized, and reached MMI. *See* Martin County Coal Co. v. Goble, 449 S.W.3d 362 (Ky. 2014).

Just because a claimant requires additional medical treatment does not mean he has not reached MMI. W.L. Harper Const. Co. v. Baker, 858 S.W.2d 202 (Ky. App. 1993). Determining when the claimant's condition stabilized, and, thus, reached MMI, is not an exact science. It depends, to a certain extent, on the date a physician actually examines the claimant.

Myers originally reached MMI on September 2, 2009. This was approximately a year and three months after Myers had her left leg amputated. Dr. Jacob assigned this date. He assigned it after reviewing Myers' medical records. He noted that Myers' activity levels had significantly increased around this time. Dr. Jacob noted that a North Carolina pain management provider issued a similar opinion around this period.

Myers remained at MMI until January 8, 2015, when Dr. Madanagopal concretely

recommended a revision and neuroma excision procedure. Although previous physicians had opined Myers would potentially require this procedure, January 9, 2015 is when a physician formally recommended it. Thus, it appears Myers required (as opposed to desired) the surgery.

Dr. Madanagopal recommended it, because Myers' excessive skin, which produced a posterior skin flap, caused significant bruising, blisters, calluses, and pain. These problems and symptoms caused Myers not to have the ability to bear weight on her stump. This, in turn, caused her not to have the ability to wear her prosthesis. Myers required the surgery to cure and stabilize these problems.

The fact Myers required a non-elective surgery, which was necessary to allow her to wear the prosthesis and walk without significant pain and problems, illustrates her left leg condition was not stabilized and her condition was likely to substantially change with medical treatment. On May 6, 2015, Dr. Madanagopal opined Myers was not at MMI. He, however, did not indicate if Myers had ever reached MMI and, if so, when she originally reached it, as well as when her left leg condition returned to a non-MMI state. The ALJ finds this occurred on January 8, 2015.

Unfortunately, Myers had difficulty obtaining the surgical pre-authorization approval. Myers underwent the procedure on March 4, 2016. She reached MMI, following her surgery, on September 6, 2016. This is the date Dr. Madanagopal,

-11-

who performed the revision procedure, assigned.

This date is more credible than the July 7, 2016 date that Dr. Jacob opined. Dr. Jacob opined Myers reached MMI on July 7, 2016, because Dr. Madanagopal released her on a per-needed basis. Dr. Jacob noted Myers never returned to Dr. Madanagopal. However, although Dr. Madanagopal released Myers on a per-needed basis, he issued a work restriction form, indicating Myers should remain off work for three more months.

Dr. Madanagopal thus wanted Myers to completely remain off work until approximately October 7, 2016. This implies Myers' condition was still healing, and had not completely stabilized. If it had, Dr. Madanagopal would have indicated Myers had permanent restrictions. Instead, he did not complete the form's restrictions section, and issued a complete off-work statement.

Dr. Madanagopal's September 6, 2016 MMI date is close to the October 7, 2016 date, when Myers' off-work statement expired. Again, MMI is not an exact science. Based on the evidence's totality, the ALJ finds Myers reached MMI on September 6, 2016.

**B) Improvement level**

KRS 342.0011(11)(a)'s second prong denies TTD benefits to individuals who have not yet reached MMI, or fully recovered, but have improved to the extent they can return to employment. Mitchell, *supra*. The

-12-

Kentucky Supreme Court, in Central Kentucky Steel v. Wise, 19 S.W.3d 657 (Ky. 2000), interpreted KRS 342.0011(11)(a)'s "return to employment" language. The Wise Court stated, "[i]t would not be reasonable to terminate the benefits of an employee when he is released to perform minimal work but not the type that is customary or that he was performing at the time of his injury."

Thus, if "minimal work" is not the claimant's customary work, or the work she performed when the injury occurred, then it does not constitute the claimant's condition reaching an improvement level that would permit a "return to employment" under KRS 342.0011(11)(a). In Livingood v. Transfreight, 467 S.W.3d 249 (Ky. 2015), the Supreme Court made it clear that Wise does not stand for the principle that workers, who are unable to perform their customary work, after an injury, are always entitled to TTD benefits.

Myers' left leg condition never reached an improvement level that would allow her to return to her customary work before her two MMI dates. The credible evidence shows Myers performed electrical labor, which required extensive activities. Merit's owner even conceded Myers' job required heavy labor. The ALJ finds, and as thoroughly outlined below, that Myers does not retain the physical capacity to perform her pre-injury job, and has never had the capacity since her work injury occurred.

-13-

**C) Weekly amount & duration**

Myers' $597.23 AWW produces a $398.15 weekly TTD rate. Merit owes this weekly amount for two TTD periods. The first period spans from March 26, 2008 through September 1, 2009. The second period spans from January 8, 2015 through September 5, 2016. Pursuant to Triangle Insulation v. Stratemeyer, 782 S.W.2d 628 (Ky. 1990), Merit is entitled to a full, dollar-for-dollar, credit, for the voluntary TTD benefits it has already paid, against any past-due disability benefits owed.

**II. Benefits per KRS 342.730, including PTD**

The claimant ". . . bears the burden of proving each of the central elements of his cause of action." Burton v. Foster Wheeler Corp., 72 S.W.3d 925 (Ky. 2002). The ALJ must determine whether Myers has a PTD or only permanent partial disability ("PPD"). This analysis includes determining whether she has a permanent impairment rating, and analyzing not just her physical capacity to perform the pre-injury work, but any work.

**A) PTD benefits**

Under KRS 342.0011(11)(c), an injured worker has a PTD if ". . . due to an injury, [she] has a permanent disability rating and has a complete and permanent inability to perform any type of work as a result of an injury . . . [.]" KRS 342.0011(34) defines work as ". . . providing services to another in return for remuneration on a regular and sustained basis in a competitive economy."

-14-

Myers has the burden of proving: (1) she sustained an "injury;" (2) the injury produced a permanent disability rating {impairment rating x statutory factor}; (3) she has a complete and permanent inability to perform any type of work due to the injury; and (4) the work injury caused the PTD. City of Ashland v. Stumbo, 461 S.W.3d 392 (Ky. 2015).

### i) Injury

Myers sustained work-related left leg and psychological injuries. The parties' experts unanimously agreed. The parties also entered into a binding stipulation. The ALJ finds Myers can prove a PTD's first necessary element.

### ii) Permanent disability rating

The injury produced a 33% (29% + 5%) permanent impairment rating. A 33% permanent impairment rating equates to a 49.50% disability rating (.33 x 1.50 x 1000). Myers can satisfy the second PTD element, and show her injury produced a permanent disability rating.

### 1. Left leg injury

Myers' left leg injury produced a 29% permanent impairment rating. Drs. Jacob and Hold agreed that Myers' three inch below-the-knee amputation produced a 28% rating. They also assigned an additional 2% rating for Myers' continued nerve symptoms and problems.

Dr. Jacob found Myers' experienced sural nerve dysesthesias, and assigned an additional 2% impairment rating. Dr. Jacob found Myers had extra impairment ratings for superficial peroneal and sural nerve sensory deficits. The extra ratings Dr. Jacob assigned equaled 2%. He actually assigned a 1.5% rating, but the AMA Guides, Fifth Edition, addresses fractional impairment ratings, on page 20, under section 2.5d, and states that "[t]he final calculated whole person impairment rating . . . should be rounded to the nearest whole number."

Utilizing the combined value charts, these ratings equal a 29% whole-person left leg rating. Dr. Jacob, however, forgot to use the chart and mistakenly assigned a 30% rating. He simply added the 28% rating with the 2% rating. However, the combined value is actually 29%. ALJs may use the AMA Guides' combined value charts, to combine multiple impairment ratings, because medical expertise is not required to use them. Caldwell Tanks v. Roark, 104 S.W.3d 753 (Ky. 2003).

Dr. Jacob's rating is more persuasive than the 29% rating Dr. Holt assigned. The reason is he considered Myers' activity level, and assigned a severity multiplier. He indicated Myers had a grade 3 sensory deficit, and issued a 50% multiplier. Dr. Holt did not perform this step.

Myers' testimony supports Dr. Jacob's rating. Myers testified she experiences ongoing left symptoms. These symptoms include experiencing radiating-type burning and pain. Activities, such as riding in a car

and mowing grass (on a riding lawnmower), aggravate her symptoms. However, Myers testified she is also able to perform activities, which include walking up to a mile, mowing her grass, and climbing the stairs to her second-floor bedroom. Dr. Jacob evaluated Myers on two separate occasions – occurring approximately three years apart – before and after her revision procedure. Dr. Holt only examined Myers on one occasion. Considering Myers' credible testimony and Dr. Jacobs' experience, the ALJ finds his impairment rating more persuasive.

## 2. Psychological injury

The left leg injury's effects produced a 5% psychological permanent impairment rating. Dr. Butler assigned this rating. Dr. Butler's rating is more persuasive than the 50% to 55% rating Dr. Wilkerson assigned. The reason is Dr. Butler rebutted Dr. Wilkerson's impairment rating. Moreover, the credible evidence does not support Dr. Wilkerson's rating.

Dr. Butler credibly explained that "[a] 50% to 55% whole person psychiatric impairment rating in Kentucky practice suggests profound, intractable, debilitating and totally disabling psychiatric symptoms that would warrant a nursing home level of care or one-to-one 24/7 observation for safety." The evidence supports this statement, and the 5% rating.

Myers has not received any psychological medical treatment for approximately a decade. Her last treatment occurred in either

-17-

2008 or 2009. Myers is also not currently using any anti-depressants, and has not done so for approximately 10 years. Her treatment lack cuts against Dr. Wilkerson's rating.

Myers admitted she essentially lives alone, because her boyfriend/husband (Kentucky does not recognize common-law marriages) travels a lot, and works out-of-town. Myers admitted she is able to care and provide for herself. This includes performing housework, mowing the yard, and occasionally running errands. The fact Myers essentially lives alone, and provides for her own needs, cuts against Dr. Wilkerson's impairment rating. The ALJ personally observed Myers, and heard her testify for approximately one hour. She presented well and successfully answered questions. Based on the evidence's totality, the ALJ finds Dr. Butler's 5% permanent and ratable the most credible and persuasive.

### iii) Complete inability to perform work

Myers cannot satisfy the test's third-prong, and show she has a complete and permanent inability to perform any type of work. The ALJ, in his analysis, must weigh and balance the evidence, as to whether Myers has the ability to provide services, for income, on a regular and sustained basis, in a competitive economy. McNutt Const. Co. v. Scott, 40 S.W.3d 854 (Ky. 2001).

When determining whether Myers has the ability to provide services, on a regular basis, in a competitive economy, the ALJ must examine and evaluate her

dependability and any physiological restrictions that would prohibit him from using his skills and vocational capabilities. Osborne v. Johnson, 432 S.W.2d 800 (Ky. 1968). The ALJ must also consider several factors, including Myers' age, education level, intellect, vocational skills, and her post-injury emotional, physical, intellectual, and vocational, statuses, as well as how these factors all interact. It further includes the likelihood she can resume some type of "work" under normal employment conditions. Hamilton, *supra*.

Myers is only 45-years old, which is a relatively young age. This is especially true in today's society, where individuals are working into their late 60s and even early 70s. She has the ability and time to pursue a new career path, or training. The ALJ finds Myers' age, when considering her intellect, vocational skills, and physical abilities, is not a limiting factor, and does not favor a PTD finding.

There is not any evidence Myers is illiterate, and cannot perform basic math. Instead, the evidence shows the opposite. She has the ability to read, write, and perform calculations. She is a high school graduate, and achieved a 3.92 grade point average. Although it is currently expired, Myers previously studied and obtained her real estate license. She achieved a 95% score. The ALJ heard Myers testify, and successfully answered questions. There is not any evidence that the injury's effects have significantly affected Myers' intellectual abilities.

Although Myers has never performed sedentary work, she has supervisor work experience. Myers has performed quality control work, and supervised a line. She instructed the line workers, and ensured the line ran smoothly. This job required performing paperwork and entering data. Myers also supervised a building project for approximately nine months. Her supervisory experience will serve Myers well.

Myers' employment history primarily includes performing construction, factory, painting, carpentry, and electrical work. The ALJ infers and finds that these jobs required following directions, performing calculations, measuring, working with others, communicating, problem-solving, utilizing judgment, and reading plans/blueprints. Myers' experience and skills should transfer to other industries. Although Myers does not have formal vocational training, other than obtaining her real estate license, she has real-world experience, training and skills, which will not prevent her from working.

Although Myers has restrictions/limitations, they do not prevent her from working. Dr. Holt, who is Myers' own expert, stated that "[s]he would be suitable for sedentary work that would allow her to work at a desktop level and would allow her to change positions occasionally." Dr. Jacob, who is Merit's expert, reached a similar conclusion. Accordingly, the parties' experts only recommended sedentary restrictions/limitations, and did not opine Myers should not or could not physically

perform any work. The ALJ finds Myers' age, education, work experience, vocational abilities, skills, and medical restrictions do not prevent her from working. The ALJ finds Myers does not have a PTD.

The ALJ determined Myers was entitled to PPD benefits enhanced by the three multiplier set forth in KRS 342.730(1)(c)1. The ALJ concluded there had been no safety violation on the part of Myers or Merit Electric. The ALJ resolved the other contested issues listed in the September 4, 2018 Order. Myers filed a petition for reconsideration making the same arguments she now makes on appeal. The October 30, 2019, Order denied Myers' petition for reconsideration as a re-argument of the merits of the claim. Significantly, Myers did not request additional findings of fact.

Myers first contends the ALJ should not have consulted the combined values chart of the AMA Guides in recalculating Dr. Jacob's impairment rating from 30% to 29%. Myers asserts that, in amending Dr. Jacob's impairment rating, the ALJ acted outside the provisions of KRS 342. Myers next argues she was entitled to PPD benefits until she was placed at MMI following the March 4, 2016, revision surgery. Myers asserts TTD benefits "should continue until [her] condition is 'not expected to improve with further treatment.'" Further, TTD benefits should not be terminated when she is released to perform minimal work but not the type that is customary. Myers maintains the medical records reveal it was always anticipated she would require additional medical treatment. She notes Dr. Madanagopal's assessment was that she would need revision surgery and she was not at MMI. Myers argues because her medical treatment was not complete until she underwent a revision surgery, she was entitled to TTD benefits until she reached MMI in either 2016 or 2017.

-21-

Myers also contends the ALJ should have relied upon Dr. Wilkerson's impairment rating of 50 to 55% as opposed to Dr. Butler's 5% impairment rating. In Myers' view, Dr. Wilkerson's opinion was based on careful consideration and Dr. Butler's opinions are not credible. Finally, Myers contends she does not retain the capacity to return to work. Myers argues her physical limitations created an inability to perform any of the jobs outlined in her deposition testimony. She contends the fact Merit Electric's carrier paid TTD from March 26, 2008, to May 25, 2014, demonstrates a "complete agreement" that she is totally disabled and incapable of returning to work. Myers posits if the carrier believed she was capable of returning to work, her benefits would have been terminated.

## ANALYSIS

KRS 342.0011(35) mandates all impairment ratings to be determined according to the AMA Guides. Thus, the ALJ is charged with determining whether an impairment rating is in accordance with the AMA Guides. The ALJ accepted Dr. Jacob's impairment rating for the left leg injury, but concluded he had erred in calculating the combined impairment rating. In his August 12, 2015, report, Dr. Jacob opined Myers had a 28% whole person impairment rating pursuant to the AMA Guides for the below-the-knee amputation of greater than three-inch stump. Because of "the neuromas of her superficial peroneal and sural nerve," the AMA Guides directs she has "an impairment secondary to a nerve deficit" for which he assessed an additional 2% impairment rating. Dr. Jacob assessed a total partial impairment rating of 30%.

In his September 5, 2018, report, Dr. Jacob reaffirmed the impairment rating as set forth in his August 12, 2015, report. However, as noted by the ALJ, Dr. Jacob failed to consult the combined values chart on page 604-605 of the AMA Guides which directs as follows: "To combine

-22-

any two impairment values, locate the larger of the values on the side of the chart and read along that row until you come to the column indicated by the smaller value at the bottom of the chart. At the intersection of the row and the column is the combined value." Thus, Myers' 28% and 2% impairment ratings must be combined. Pursuant to the combined values chart, Myers has a 29% impairment rating. Within his discretion, the ALJ is permitted to consult the AMA Guides in determining if Dr. Jacob's impairment rating is AMA Guides compliant. Notably, the impairment ratings assessed by Drs. Richard Holt and Jacob mirrored each other. However, Dr. Holt used the combined values chart and determined Myers' combined impairment rating is 29%.

Myers' reliance upon RCS Transportation v. Malin, 2010-CA-001229-WC, rendered September 23, 2011, Designated Not To Be Published, is misplaced. In Malin, the ALJ reassessed the impairment rating. Notably, in Malin the Court of Appeals acknowledged the ALJ may reference the AMA Guides in determining which impairment rating is more credible or more accurate, but he cannot recalculate the impairment rating. Slip Op. at 4. As pointed out in Malin, Caldwell Tanks v. Roark, 104 S.W.3d 753 (Ky. 2003) permits the action taken by the ALJ in the case *sub judice*. In Roark, the Kentucky Supreme Court explained:

> Although medical expertise is required to perform audiometric testing, it is apparent that no medical expertise is required to read this conversion table. For that reason, we are of the opinion that when faced with unrefuted evidence of increased hearing impairment in the relevant period, the ALJ was both authorized and required to consult the appropriate edition of the Guides and to convert the 1998 hearing impairment into an AMA whole-body impairment.

-23-

Id. at 757.

Here, Dr. Jacob failed to consult the combined values chart. Thus, the ALJ is authorized to accept Dr. Jacob's impairment ratings of 28% and 2%. However, he may also consult the AMA Guides in determining whether Dr. Jacob's combined impairment rating was in accordance with the AMA Guides. In reviewing the combined values chart, the ALJ determined it was not. The ALJ's ability to consult the combined values chart to determine if the doctor had correctly utilized the chart was specifically permitted in Pella Corporation v. Bernstein, 336 S.W.3d 451, 454 (Ky. 2011) wherein the Supreme Court directed:

> An ALJ may rely on at least some of the conversion tables found in the *Guides*, such as the tables used to combine whole-person impairment ratings or to convert a binaural hearing impairment to a whole-person impairment.

The ALJ acted within his authority in finding Myers had a combined 29% impairment rating pursuant to the AMA Guides. The ALJ's determination of Myers' physical impairment rating will remain undisturbed.

Myers' second argument relates to the ALJ's determination she attained MMI on September 2, 2009, following the June 2008 amputation surgery. Myers contends she did not attain MMI until she underwent the revision surgery in 2016 performed by Dr. Madanagopal. We disagree. The date an injured worker reaches MMI and the assessment of an impairment rating under the AMA Guides are medical questions to be answered by medical experts. Kroger v. Ligon, 338 S.W.3d 269 (Ky. 2011). Within his discretion, the ALJ relied upon Dr. Jacob's medical opinion in determining Myers reached MMI on September 2, 2009. In his August 12, 2015,

-24-

report, in support of his opinion Myers had reached MMI on September 2, 2009, Dr. Jacob provided the following:

> This is based on review of her medical records and the opinion expressed by Carolina Pain Management at that time. It is further to be noted that by May 2009, she was able to walk over 1900 feet without a loss of balance. She was able to climb a ladder and could carry 60 pounds 100 feet and was wearing her prosthesis 90% of the time. Although she may have been having some stump issues and subsequently had socket replacements, this is not relevant to the fact that from the injury and the amputation she had at that time reached maximum medical improvement and the need for additional medical care is independent of that determination as is the fact that she is now considering a stump revision.

Myers' assertion aside, the above opinion from Dr. Jacob constitutes substantial evidence supporting the ALJ's determination that she first attained MMI after the work injury on September 2, 2009.

As the claimant in a workers' compensation proceeding, Myers had the burden of proving each of the essential elements of her claim, including her entitlement to TTD benefits during the period in question. Snawder v. Stice, 576 S.W.2d 276 (Ky. App. 1979). Since Myers was unsuccessful in convincing the ALJ she had not attained MMI prior to the revision surgery in 2016, the question on appeal is whether the evidence compels a different result. Wolf Creek Collieries v. Crum, 673 S.W.2d 735 (Ky. App. 1984). "Compelling evidence" is defined as evidence that is so overwhelming no reasonable person could reach the same conclusion as the ALJ. REO Mechanical v. Barnes, 691 S.W.2d 224 (Ky. App. 1985).

-25-

The function of the Board in reviewing the ALJ's decision is limited to a determination of whether the findings made by the ALJ are so unreasonable under the evidence that they must be reversed as a matter of law. Ira A. Watson Department Store v. Hamilton, 34 S.W.3d 48 (Ky. 2000).

As fact-finder, the ALJ has the sole authority to determine the weight, credibility and substance of the evidence. Square D Co. v. Tipton, 862 S.W.2d 308 (Ky. 1993). Similarly, the ALJ has the discretion to determine all reasonable inferences to be drawn from the evidence. Miller v. East Kentucky Beverage/Pepsico, Inc., 951 S.W.2d 329 (Ky. 1997); Jackson v. General Refractories Co., 581 S.W.2d 10 (Ky. 1979). The ALJ may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same adversary party's total proof. Magic Coal Co. v. Fox, 19 S.W.3d 88 (Ky. 2000). Although a party may note evidence that would have supported a different outcome than that reached by an ALJ, such proof is not an adequate basis to reverse on appeal. McCloud v. Beth-Elkhorn Corp., 514 S.W.2d 46 (Ky. 1974). The Board, as an appellate tribunal, may not usurp the ALJ's role as fact-finder by superimposing its own appraisals as to the weight and credibility to be afforded the evidence or by noting reasonable inferences that otherwise could have been drawn from the record. Whittaker v. Rowland, 998 S.W.2d 479, 481 (Ky. 1999). So long as the ALJ's ruling with regard to an issue is supported by substantial evidence, it may not be disturbed on appeal. Special Fund v. Francis, 708 S.W.2d 641, 643 (Ky. 1986).

As previously pointed out, MMI is a medical determination. Dr. Jacob provided an in-depth explanation for his conclusion Myers attained MMI on September 2, 2009. The fact Myers underwent a revision surgery eight years after the accident does not mandate a

-26-

finding she had not reached MMI prior to the revision surgery.

In discussing the presence of MMI, the Court of Appeals in <u>W.L. Harper Const. Co., Inc. v. Baker</u>, 858 S.W.2d 202, 204-205 (Ky. App. 1993) explained:

> Larson provides further helpful explanation regarding the issue of stabilization. Specifically, he notes that the question may be purely a medical issue in that the medical evidence indicates recuperation is not yet over, since further healing or strengthening may be anticipated, and it is too early to appraise the claimant's permanent disability. Larson, § 57.12(c). On the other hand, the medical testimony may establish that the claimant is as recovered as he will ever be, and any lingering disability is permanent. *Id*. Moreover, just because some treatment is still necessary, such as drug treatment or physical therapy, does not preclude a finding that the condition is stabilized if the underlying condition causing the disability has become stable and no additional treatment will improve the condition. *Id*. However, if treatment is rendered in the hope of improving the condition, the subsequent discovery that no improvement resulted does not bar a finding that the healing period continued throughout the treatment process. *Id*. It is further noted that the persistence of pain alone, even when the pain fluctuates, does not prevent a finding that the healing period is over, provided the underlying condition is stable, and additional treatment will not be helpful. *Id*. As the Board noted, since Kentucky does not recognize the concept of temporary partial disability, any discussion of TTD

must be read in conjunction with the definition of total occupational disability set forth in *Osborne v. Johnson*, Ky., 432 S.W.2d 800, 803 (1968):

> If the Board finds that the workman is so physically impaired that he is not capable of performing any kind of work of regular employment, or if the board finds that regular employment in the kind of work the man can perform is not available on the local labor market, the man will be considered to be *totally* disabled. Otherwise he will be considered to be only *partially* disabled.

> To summarize, TTD is payable until the medical evidence establishes the recovery process, including any treatment reasonably rendered in an effort to improve the claimant's condition, is over, or the underlying condition has stabilized such that the claimant is capable of returning to his job, or some other employment, of which he is capable, which is available in the local labor market. Moreover, as the Board noted, the question presented is one of fact no matter how TTD is defined.

The above language is applicable to Myers' situation. The ALJ noted Myers' activity level had increased around this time, and Dr. Jacob noted Carolina Pain Management provided a similar opinion around this period. The ALJ then determined Myers remained at MMI from September 2, 2009, through January 8, 2015, at which time Dr. Madanagopal concretely recommended

a revision and neuroma excision procedure. Notably, Myers does not take issue with the ALJ's determination she was not at MMI on January 8, 2015. The ALJ determined that following her surgery on March 14, 2016, Myers again attained MMI on September 6, based on Dr. Madanagopal's assessment of MMI. Myers does not challenge the finding she was not at MMI from January 8, 2015, through September 6, 2016, as found by the ALJ.

On September 3, 2018, Myers filed a signed but undated medical questionnaire completed by Dr. Madanagopal in which he indicated as follows:

> 1. Do you believe Xenia Myers is at maximum medical improvement? Yes. Date 9-6-2016.
>
> 2. If not, how long do you anticipate it will be before she is at maximum medical improvement? No response.
>
> 3. If so, what is her impairment rating? Please ask IME to do impairment rating.

The ALJ could rely upon September 6, 2016, as the date Myers attained MMI following revision surgery.

As noted by the Supreme Court in Tokico (USA), Inc. v. Kelly, 281 S.W.3d 771, 775-776 (Ky. 2009):

> MMI refers to the time at which a worker's condition stabilizes so that any impairment may reasonably be viewed as being permanent. [footnote omitted] The need for additional treatment does not preclude a finding that a worker is at MMI. [footnote omitted]
>
> . . .

-29-

Although she received additional treatment after his evaluation, we are not convinced that the evidence compelled the ALJ to determine that Dr. Sprague rated her impairment prematurely or that Dr. Ruth's opinion was more credible.

The ALJ could reasonably infer Myers' situation was encompassed by Baker, supra, and Kelly, supra. Since the date of MMI is supported by substantial evidence in the form of medical opinions from Drs. Jacob and Madanagopal, this Board has no authority to usurp the ALJ's reliance upon that medical evidence in determining Myers' entitlement to TTD benefits. Consequently, the award of TTD benefits will remain unaltered.

Similarly, we find no merit in Myers' third argument the ALJ erred in relying upon Dr. Butler's opinion instead of Dr. Wilkerson's opinions. Dr. Butler's May 15, 2019, report sets out the medical records and testimony he reviewed. Based on his interview, the information reviewed, and the April 7, 2019, Independent Psychological/ Neuropsychological Evaluation of Dr. Wayne J. Harper, a licensed psychologist, Dr. Butler concluded as follows:

> . . . an appropriate whole person impairment rating utilizing the 2nd Edition of the AMA Guides, in my opinion, is in the high range of Class 1 at five percent (5%).
>
> This represents a whole person impairment from all circumstances of ten-percent (10%), a Class 2 rating, diminished by one-half to take account of the pre-existing traumatic circumstances unrelated to the workplace accident of March 25, 2008, [with] a resultant whole person impairment rating of

five-percent (5%) directly attributable to the workplace injury.

Dr. Butler's opinions constitute substantial evidence supporting the finding of a 5% impairment rating caused by the work-related psychological injury. Contrary to Myers' assertion, the ALJ was free to rely upon Dr. Butler's opinions in reaching a determination regarding the impairment rating attributable to her psychological injury. Kentucky Utilities Co. v. Hammons, 145 S.W.2d 67, 71 (Ky. [] 1940) (citing American Rolling Mill Co. v. Pack et al., 128 S.W.2d 187, 190 (Ky. [] 1939). While Myers is correct that the contrary opinion espoused by Dr. Wilkerson could have been relied on by the ALJ to support a different outcome in her favor, in light of the remaining record, the views articulated by Dr. Wilkerson represent nothing more [than] conflicting evidence compelling no particular result. Copar, Inc. v. Rogers, 127 S.W.3d 554 (Ky. 2003). As previously stated, where the evidence with regard to an issue preserved for determination is conflicting, the ALJ, as fact-finder, is vested with the discretion to pick and choose whom and what to believe. Caudill v. Maloney's Discount Stores, 560 S.W.2d 15 (Ky. 1977). Consequently, we find no error in the ALJ's reliance upon Dr. Butler in determining the impairment rating attributable to Myers' psychological work injury.

Finally, we are unconvinced by Myers' argument asserting the ALJ erred in finding she was only partially disabled and not totally permanently disabled. The ALJ stated he considered Myers' ability to provide services for income on a regular sustained basis in a competitive economy. He identified the factors he must consider in determining Myers is not permanently totally occupationally disabled. The ALJ concluded Myers' age does not favor a finding of permanent total disability. Further, the ALJ found her education, intelligence, and work experience mitigated against a finding of permanent total disability. Myers also had supervisory experience

which the ALJ believed would serve her well. Significantly, the ALJ relied upon Dr. Holt's opinion that Myers would be "suitable for sedentary work that would allow her to work at a desktop level and would allow her to change positions occasionally." As noted by the ALJ, Dr. Jacob was of a similar opinion as reflected in his August 15, 2015, report in which he stated as follows:

> It is my further opinion that she is capable of returning to work in the light physical demand capacity. If she elects to proceed with the stump revision and after an anticipated six months of stump maturation with a reconditioning program, she may be able to work in the medium capacity. According to the prosthetist, there are prostheses available for individuals engaged in the construction trades.

Dr. Jacob reiterated that opinion in his September 5, 2018, report:

> Even in the absence of that according to the comprehensive assessment as done by the prosthetist one year ago, she is functioning at a very good level from the amputation and the prosthesis. She is capable of being gainfully employed in the light to medium category although I would avoid activities of marked uneven ground, heights, or need for repetitive stair climbing. As noted by the prosthetist, she is an active community ambulatory. It is my opinion she has had a good result from the stump revision and her stump today is markedly improved over her status in 2015.
>
> It is my opinion that she is capable of lift and carry up to 30 pounds occasional and 20 pounds frequent. She may walk up to one

mile at a normal cadence, and may stand for 2 hours with a 10 to 15 minute break. Sitting is unlimited.

We disagree the actions of Merit Electric's insurance carrier somehow mandate a finding that Myers is totally occupationally disabled. The ALJ is not required to attribute any significance to the actions of the carrier in adjusting the claim. Stated another way, the actions of the carrier do not mandate a particular finding by the ALJ. Rather, the ALJ's determination is to be based upon the lay and medical evidence. More importantly, we note Myers did not question the sufficiency of the ALJ's analysis in determining the extent of her occupational disability. Further, Myers did not request additional findings of fact or a more explicit ruling in her petition for reconsideration, as required by KRS 342.281 and KRS 342.285. As such, the issue is not properly preserved for review by this Board. *See* Bullock v. Goodwill Coal Co., 214 S.W.3d 890, 893 (Ky. 2007) (failure to make statutorily-required findings of fact is a patent error which must be requested in a petition for reconsideration in order to preserve further judicial review). That fact aside, the ALJ conducted the appropriate analysis as required by the statute and case law and substantial evidence supports the ALJ's ultimate determination as to the extent of Myers' occupational disability.

Having concluded the ALJ conducted the appropriate analysis and his decision is supported by the record and the opinions of Drs. Holt and Jacob, we are without authority to disturb the ALJ's decision that Myers is not totally occupationally disabled. Special Fund v. Francis, supra.

As indicated, we find no error with the Board's opinion and resolution of the issues presented by Myers in this appeal, and we have adopted its analysis. We therefore AFFIRM.

ALL CONCUR.

BRIEF FOR APPELLANT:

S. Scott Marcum
Paducah, Kentucky

BRIEF FOR APPELLEE MERIT ELECTRIC, LLC:

R. Christion Hutson
Paducah, Kentucky